Alan D. Halperin (AH8432)
Neal W. Cohen (NC-3573)
HALPERIN BATTAGLIA RAICHT, LLP
555 Madison Avenue - 9th Floor
New York, New York 10022
Telephone: (212) 765-9100
Facsimile: (212) 765-0964

James B. Heaton, III
Steven J. Nachtwey
John D. Byars
BARTLIT BECK HERMAN PALENCHAR & S
54 West Hubbard Street, 3rd Floor
Chicago, IL 60610
Telephone: (312) 494-4400
Facsimile: (312) 494-4440

*Co-counsel for Plaintiff OCEAN RIDGE CAPITAL ADVISORS, LLC,
as Litigation Trustee of THE MAS LITIGATION TRUST*



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

JUDGE SCHEINDLIN

| | |
|---|---|
| OCEAN RIDGE CAPITAL ADVISORS, LLC, as Litigation Trustee of THE MAS LITIGATION TRUST[1]<br><br>     Plaintiff,<br><br>  -against-<br><br>METROPOLITAN LIFE INSURANCE COMPANY, THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY, CAPITAL D'AMERIQUE CDPQ INC., CAISSE DE DEPOT ET PLACEMENT DU QUEBEC, CSFB LP HOLDING, SKOOG FAMILY INVESTMENTS, LLC, BANCAMERICA CAPITAL INVESTORS II, L.P., WINDWARD/PARK AB III, L.L.C.; WINDWARD CAPITAL PARTNERS L.P., WINDWARD CAPITAL ASSOCIATES, L.P., SUEZ CAPITAL PARTNERS II, L.P., INDOSUEZ CAPITAL CO-INVEST PARTNERS, L.P., SCP II ASSOCIATES, CREDIT SUISSE FIRST BOSTON (USA), INC., CREDIT SUISSE FIRST BOSTON, GOLDMAN SACHS CREDIT PARTNERS L.P., JEFFREY A. ANDERSON, JON F | Case No.<br><br>07 CV<br><br>3213<br><br><br><u>**COMPLAINT**</u><br><br><br><u>**JURY TRIAL DEMANDED**</u> |

[1] The bankruptcy debtors are: Meridian Automotive Systems - Composites Operations, Inc. (Tax ID No xx-xxx4575), Meridian Automotive Systems, Inc (Tax ID No xx-xxx2037), Meridian Automotive Systems - Angola Operations, Inc (Tax ID No xx-xxx1350), Meridian Automotive Systems - Construction, Inc. (Tax ID No. xx-xxx8056), Meridian Automotive Systems - Detroit Operations, Inc (Tax ID No xx-xxx2825), Meridian Automotive Systems - Grand Rapids Operations, Inc (Tax ID No xx-xxx0780), Meridian Automotive Systems - Heavy Truck Operations, Inc (Tax ID No xx-xxx3247), Meridian Automotive Systems - Shreveport Operations, Inc. (Tax ID No xx-xxx0613), and Meridian Automotive Systems - Mexico Operations, LLC (Tax ID No xx-xxx2291), each with a mailing address of 999 Republic Drive, Allen Park, MI 48101 (hereinafter "Meridian")

BAKER, JOSE R. GARCIA, ROBERT H BARTON III,  :
H.H. WACASER, PETER S. MACDONALD, GARY        :
SWENSON, JOHN F. MAYPOLE, THOMAS GRAHAM, :
DONALD A MCKAY, HENRY A. NICKOL, JEFFREY  :
HODGMAN, A. KIPP KOESTER, CRAIG VAN ESS,      :
GURMINDER S. BEDI, THOMAS WALKER, JACK        :
SKOOG AND DEAN VANEK                          :
                                             :
                              Defendants.    :

---

Ocean Ridge Capital Advisors, LLC, the duly appointed bankruptcy litigation trustee (the

"Litigation Trustee") for The MAS Litigation Trust (the "Litigation Trust"), by its attorneys

hereby states and alleges its Complaint against the above captioned Defendants as follows:

### NATURE OF THE ACTION

1.      On June 22, 2004, investment bankers from CSFB (as defined in ¶53 below)

made a presentation to attendees at a closing dinner to celebrate the funding of a massive new

$485 million financing package (the "2004 Refinancing") to Meridian (as defined in footnote 1)

Two months before the closing dinner, on April 28, 2004, Meridian had replaced its previous

bank debt facility from Bank of America, N.A ("Bank of America") with $337 million of the

proceeds of the 2004 Refinancing. Meridian was insolvent before and after it received the

proceeds of the 2004 Refinancing  Meridian's auditor, PriceWaterhouseCoopers, did not believe

that Meridian would last as a going concern to the end of 2004 without the small amount of

breathing room provided by the 2004 Refinancing

2.      At the time of the 2004 Refinancing, Meridian was a leading supplier to the

automotive industry of front and rear end modules, bumper systems, exterior composite plastic

modules, structural components, and interior and lighting components. Meridian was

incorporated under the laws of Michigan and headquartered in Dearborn, Michigan. Meridian

had twenty primary manufacturing locations in the United States including New York, as well as other manufacturing facilities located in Canada and in Mexico. Meridian supplied its products primarily to Ford, GM, DaimlerChrysler and other automobile manufacturers including Toyota, Honda, Subaru, Mazda and Mitsubishi. Meridian's products were installed in such best-selling vehicles as the Ford F-Series Truck, the Cadillac Escalade SUV, the Dodge RAM, the Lincoln Navigator and the Dodge Caravan.

3        The 2004 Refinancing came at a high cost to Meridian. Meridian paid more than $21 million in transaction fees out of the proceeds from the 2004 Refinancing to CSFB, Goldman Sachs Credit Partners L.P. ("Goldman Sachs) and others. CSFB and Goldman Sachs received more than $20 million of those transaction fees. This was a large part of the reason CSFB and Goldman were celebrating at the closing dinner. Worse, Meridian paid more than $60 million of the proceeds from the 2004 Refinancing as a massive payout to Meridian insiders, mostly large insurance companies and Wall Street investment firms. Those insiders used their control of Meridian's board of directors to cause Meridian to pay out this money, even though Meridian desperately needed to retain it and even though it rightfully should have been available to benefit all of Meridian's creditors.

4.        By stripping assets out of Meridian, these insiders engaged in an outrageous, self-dealing cash grab designed to hinder, delay, and defraud Meridian's creditors by diminishing the property that would ultimately be available to satisfy claims in Meridian's bankruptcy. As a result of their intentional efforts to hinder, delay, and defraud Meridian's creditors, these Meridian insiders used their control of Meridian's day-to-day operations and board level decision-making to obtain more than they ever could have hoped to receive in lawful distributions in Meridian's bankruptcy proceeding. In doing so, the Meridian insiders and the

3

investment professionals like CSFB and Goldman Sachs showed a reckless indifference to the rights of others

5.    CSFB and other Defendants celebrated their outrageous conduct at the closing dinner, where the transaction fees and the $60 million cash grab were fodder for jokes. In a slide presentation to the assembled celebrants – complete with video clips from movies including "The Godfather," "Get Shorty," "Ben Hur," "Dumb and Dumber," and "Animal House" – the bankers joked about the audacious looting that had accompanied the new loan. The bankers asked in one slide "Which of the following should you avoid when marketing a bank deal?" The answer the bankers gave, referring to the Meridian insiders described above: "Pay the mezz holders a massive dividend":



CONFIDENTIAL

## Marketing A Bank Deal...

**Which of the following should you avoid when marketing a bank deal?**

A.    Commit Fraud

B.    Union strike

C.    Toxic Emissions

D.    Pay the mezz holders a massive dividend

*"No Whining"*

6

6      This was not a joking matter for Meridian and its creditors, however. When the dust settled, Meridian was even more insolvent than it had been before the new loan. Not surprisingly, less than one year after the 2004 Refinancing and the massive payments to insiders, on April 26, 2005, Meridian declared bankruptcy.

7.      The Litigation Trustee brings this action, pursuant to its statutory and contractual authority, against the insiders, directors, and arrangers who orchestrated and benefited from this looting to recover the preferential and fraudulent transfers, and to recover damages for the unlawful distributions, breaches of fiduciary duties, and aiding and abetting of these wrongs. As shown below, the Defendants have engaged in egregious acts of self-dealing, corporate waste

and other outrageous conduct with reckless indifference to the rights of others, which caused

damage to Meridian and its creditors.

**JURISDICTION AND VENUE**

8.    This Court has subject matter jurisdiction over this civil action pursuant to 28

U S C §§1331, 1334 and 1367, as it is a civil proceeding arising under title 11 of the United

States Code, including but not limited to §§541, 544, 547, 548 and 550.

9.    Venue is proper in this district pursuant to 28 U S C §§ 1391 and 1409.

**THE PARTIES**

*The Plaintiff*

10.    Plaintiff is the Litigation Trustee of the Litigation Trust, duly appointed pursuant

to the Litigation Trust Agreement between Meridian and certain of its subsidiaries and the

Litigation Trustee dated December 29, 2006. The Trustee's principal place of business is 56

Harrison Street, Suite 203A, New Rochelle, New York 10801   The Litigation Trust Agreement

was executed in connection with the Fourth Amended Joint Plan of Reorganization under

Chapter 11 of the Bankruptcy Code Proposed by Meridian, dated October 25, 2006, as amended

on December 4, 2006, and confirmed by the United States Bankruptcy Court for the District of

Delaware on December 6, 2006 (the "Plan")

11.    Plaintiff holds, as Litigation Trustee, all causes of action asserted in this

Complaint and has sole standing to pursue them effective December 29, 2006. Under the terms

of the Plan and the Litigation Trust Agreement, the Litigation Trustee holds all Avoidance

Actions and Reserved Actions as noted in the Litigation Trust Agreement:

6

> B.    Pursuant to the Plan. the Litigation Trust is established for the purposes of pursuing all Avoidance Actions (other than any Avoidance Actions released pursuant to the terms of the Plan) and all Reserved Actions (such Avoidance Actions and Reserved Actions being referred to herein collectively as the "Actions") and distributing any proceeds derived therefrom to the Beneficiaries. all in accordance with the terms of the Plan and this Agreement.

12    The Plan sets forth that the Avoidance and Reserved Actions include:

> "Avoidance Actions" means all actions, causes of action or claims of the Debtors or their Estates under Chapter 5 of the Bankruptcy Code, whether or not commenced as of the Effective Date. except that the term Avoidance Actions shall not include the Lien Avoidance Action

> "Reserved Actions" means Causes of Action that are based in whole or part on any act, omission, transaction, event or other occurrence taking place on or prior to the Petition Date, including, without limitation, any Causes of Action against any former officers or directors of the Debtors which have not otherwise been released pursuant to Section 10.3 and any Cause of Action (other than under Section 506(b) of the Bankruptcy Code with respect to (i) the ability of Milbank, Tweed, Hadley & McCloy LLP ("Milbank") to be retained under the Prepetition First Lien Credit Agreement and (ii) an argument that the Prepetition First Lien Lenders were undersecured) in connection with any adequate protection payments paid or payable by the Debtors to Milbank under the DIP Order; provided that the Reserved Actions shall not include (a) any Avoidance Actions, (b) the Lien Avoidance Action, (c) any Causes of Action released, waived or extinguished under this Plan (including the releases granted in favor of any Meridian Covered Person pursuant to Section 10.3 hereof) or by Final Order of the Bankruptcy Court entered prior to the Effective Date or (d) any Retained Actions

***The Institutional Insider Defendants***

13      Certain Defendants were institutional investors who were controlling investors.
These Institutional Insider Defendants (as defined in ¶27 herein) used their control to initiate the
2004 Refinancing to cause Meridian to transfer more than $60 million to them in an intentional
effort to hinder, delay, and defraud Meridian's creditors, and to prefer themselves over
Meridian's creditors in advance of a bankruptcy filing.  The Institutional Insider Defendants
took their money in supposed repayment of what they called "mezzanine debt " If the so-called
mezzanine debt was, in fact, debt, then, as alleged in detail below, these Institutional Insider
Defendants received, at a minimum, preferences as defined in 11 U.S.C. § 547, because they
were insiders within the meaning of 11 U.S C § 101(31) and the transfers meet all other
requirements of 11 U.S C. § 547  These Defendants also received voidable preferences under
corresponding state laws including but not limited to the laws of Michigan and/or New York.

14      If the "mezzanine debt" was in fact equity and not debt, then the Institutional
Insider Defendants took their money as an intentionally and constructively fraudulent transfer in
violation of 11 U.S.C. § 548 and state fraudulent transfer statutes including but not limited to
Mich  Comp  Laws § 566.34 and/or New York Debtor and Creditor Law, Article 10, Sections
273-276, because the equity was worthless. Alternatively, these Institutional Insider Defendants
received unlawful distributions under Michigan corporation law  The Institutional Insider
Defendants are also liable as aiders and abettors and civil conspirators in the unlawful scheme to
loot Meridian's assets

15.      Defendant Metropolitan Life Insurance Company ("MetLife") is a New York
corporation with its principal place of business at One Madison Avenue, New York, New York
10010. Defendant MetLife was a Meridian insider as defined in 11 U.S.C. § 101(31) and

applicable case law, and corresponding state laws including but not limited to Mich. Comp

Laws § 566.31 and applicable case law and applicable New York case law. Upon information

and belief, Defendant MetLife had the right to make appointments to Meridian's board of

directors, appointed board observers and controlled directly and/or indirectly over 20% of the

voting power in Meridian at the time of the 2004 Refinancing. Defendant MetLife acted, in part,

through the knowledge and actions of Defendants Jeffrey Hodgman and John F. Maypole, who

served on Meridian's board of directors at the time of the 2004 Refinancing. Defendant MetLife

also acted, in part, through the knowledge and actions of Susan Garrett, who served as MetLife's

board observer at the time of the 2004 Refinancing. As a result, MetLife exerted control over

Meridian's day-to-day business affairs, including all of its decisions with respect to Meridian's

financing choices and the use of proceeds from the 2004 Refinancing. Defendant MetLife

received approximately $20.5 million in illegal payments from Meridian.

   16.   Defendant The Northwestern Mutual Life Insurance Company ("Northwestern

Mutual") is a Wisconsin corporation with its principal place of business at 720 East Wisconsin

Avenue, Milwaukee, Wisconsin 53203. Upon information and belief, Defendant Northwestern

Mutual was a Meridian insider as defined in 11 U.S.C. § 101(31) and applicable case law, and

corresponding state laws including but not limited to Mich. Comp. Laws § 566.31 and applicable

case law and applicable New York case law. Northwestern Mutual and entities it controlled had

the right to make appointments to Meridian's board of directors, appointed board observers and

controlled directly and/or indirectly over 20% of the voting power in Meridian. Defendant

Northwestern Mutual acted, in part, through the knowledge and actions of Defendant A. Kipp

Koester, who served on Meridian's board of directors at the time of the 2004 Refinancing.

Defendant Northwestern Mutual also acted, in part, through the knowledge and actions of Tim

9

Wegener, who served as MetLife's board observer at the time of the 2004 Refinancing.  As a result, Northwestern Mutual exerted control over Meridian's day-to-day business affairs, including all of its decisions with respect to Meridian's financing choices and the use of proceeds from the 2004 Refinancing.  Defendant Northwestern Mutual received approximately $16.8 million in illegal payments from Meridian.

17    Defendant Capital d'Amérique CDPQ Inc. is a Quebec corporation with its principal place of business at 1000 Place Jean Paul Riopelle, Montreal, QC H2Z 2B3, Canada. Defendant Caisse de dépôt et placement de Québec is a Quebec corporation with its principal place of business at 1000 Place Jean Paul Riopelle, Montreal, QC H2Z 2B3, Canada.  Caisse de dépôt et placement de Québec is an affiliate and 100% owner of Capital d'Amérique CDPQ Inc. Upon information and belief, Capital d'Amérique CDPQ Inc. assigned its relevant interests in Meridian to Caisse de dépôt et placement de Québec.  These affiliated companies will be referred to hereinafter as "Caisse."  Upon information and belief, Caisse was a Meridian insider as defined in 11 U.S.C. § 101(31) and applicable case law, and corresponding state laws including but not limited to Mich. Comp. Laws § 566.31 and applicable case law and applicable New York case law.  Caisse and entities it controlled had the power to make appointments to Meridian's board of directors, appointed board observers such as Luc Houle and controlled directly and/or indirectly over 20% of the voting power in Meridian.  As a result, Caisse exerted control over Meridian's day-to-day business affairs, including all of its decisions with respect to Meridian's financing choices and the use of proceeds from the 2004 Refinancing.  Caisse received approximately $7.2 million in illegal payments from Meridian.

18.    Defendant Skoog Family Investments, LLC, ("Skoog") is a Michigan limited liability company with its principal place of business at 111 Lyon Street NW, Grand Rapids,

10

Michigan 49503. Upon information and belief, Defendant Skoog was a Meridian insider as

defined in 11 U.S.C. § 101(31) and applicable case law, and corresponding state laws including

but not limited to Mich. Comp. Laws § 566.31 and applicable case law and applicable New York

case law. Defendant Skoog had the right to make appointments to Meridian's board of directors

and exercised considerable influence over Meridian. Defendant Skoog acted, in part, through the

knowledge and actions of Defendant Craig Van Ess, who served on Meridian's board of

directors at the time of the 2004 Refinancing. As a result, Skoog exerted control over Meridian's

day-to-day business affairs, including all of its decisions with respect to Meridian's financing

choices and the use of proceeds from the 2004 Refinancing. Defendant Skoog received $6.7

million in illegal payments from Meridian.

    19.    Defendant Windward/Park AB III, L.L.C. ("Windward/Park") is a Delaware

limited liability company with its principal place of business at 712 Fifth Avenue, 21st Floor,

New York, New York 10019. Upon information and belief, Defendant Windward/Park was a

Meridian insider as defined in 11 U.S.C. § 101(31) and applicable case law, and corresponding

state laws including but not limited to Mich. Comp. Laws § 566.31 and applicable case law and

applicable New York case law. Defendant Windward/Park had the power to make appointments

to Meridian's board of directors and appointed affiliated board observers including Adam Gruber

and Scott Spielvogel. Defendant Windward/Park acted, in part, through the knowledge and

actions of Defendants MacDonald and Swenson who served as members of Meridian's board of

directors at the time of the 2004 Refinancing while at the same time acting as managing directors

of Windward/Park. As a result, Windward/Park exerted control over Meridian's day-to-day

business affairs, including all of its decisions with respect to Meridian's financing choices and

the use of proceeds from the 2004 Refinancing. Defendant Windward/Park received

approximately $4.2 million in illegal payments from Meridian.

     20.     On information and belief, CSFB LP Holding ("CSFB Holding") is a Zug

(Switzerland) corporation with an office at 11 Madison Avenue, New York, New York 10010.

Upon information and belief, Defendant CSFB Holding was a Meridian insider as defined in 11

U.S.C. § 101(31) and applicable case law, and corresponding state laws including but not limited

to Mich. Comp. Laws § 566.31 and applicable case law and applicable New York case law.

Defendant CSFB Holding, through affiliated entities and entities it controlled, had the power to

make appointments to Meridian's board of directors, appointed board observers which included

Alan Freudenstein and Greg Grimaldi, and controlled directly and/or indirectly approximately

14% of the voting power in Meridian. As a result, CSFB Holding exerted control over

Meridian's day-to-day business affairs, including all of its decisions with respect to Meridian's

financing choices and the use of proceeds from the 2004 Refinancing. Defendant CSFB Holding

received approximately $2.3 million in illegal payments from Meridian.

     21.     Defendant BancAmerica Capital Investors II, L.P. ("BACI") is a Delaware

limited partnership with its principal place of business at 231 S. LaSalle Street, 7th Floor,

Chicago, Illinois 60697. Upon information and belief, Defendant BACI was a Meridian insider

as defined in 11 U.S.C. § 101(31) and applicable case law, and corresponding state laws

including but not limited to Mich. Comp. Laws § 566.31 and applicable case law and applicable

New York case law. Defendant BACI had the right to appoint observers to Meridian's board of

directors which included Cheryl Bartol and Jason Mehring and exerted control over Meridian's

day-to-day business affairs, including all of its decisions with respect to Meridian's financing

choices and the use of proceeds from the 2004 Refinancing. Defendant BACI received

approximately $1.1 million in illegal payments from Meridian.

22.    Defendant Windward Capital Partners, L.P. ("WCP") is a Delaware limited

partnership with its principal place of business at 712 Fifth Avenue, 21st Floor, New York, New

York 10019. Upon information and belief, Defendant WCP was a Meridian insider as defined in

11 U.S.C. § 101(31) and applicable case law, and corresponding state laws including but not

limited to Mich. Comp. Laws § 566.31 and applicable case law and applicable New York case

law. Defendant WCP had the power to make appointments to Meridian's board of directors and

appointed affiliated board observers including Adam Gruber and Scott Spielvogel. Defendant

WCP acted, in part, through the knowledge and actions of Defendants MacDonald and Swenson

who served as members of Meridian's board of directors at the time of the 2004 Refinancing

while at the same time acting as managing directors of WCP.  As a result, WCP exerted control

over Meridian's day-to-day business affairs, including all of its decisions with respect to

Meridian's financing choices and the use of proceeds from the 2004 Refinancing.  Defendant

WCP received $580,288 in illegal payments from Meridian.

23.    Defendant Suez Capital Partners II, L.P. ("Suez Capital") is a Delaware limited

partnership with its principal place of business at Chez S1 Finance, 68 Rue de Faubourg Saint

Honore, 75008 Paris, France.  Upon information and belief, Defendant Suez Capital was a

Meridian insider as defined in 11 U.S.C. § 101(31) and applicable case law, and corresponding

state laws including but not limited to Mich. Comp. Laws § 566.31 and applicable case law and

applicable New York case law.  Defendant Suez Capital had the right to make appointments to

Meridian's board of directors and exerted control over Meridian's day-to-day business affairs,

including all of its decisions with respect to Meridian's financing choices and the use of proceeds

13

from the 2004 Refinancing. Defendant Suez Capital received $412,521in illegal payments from Meridian.

24    Defendant Windward Capital Associates, L.P. ("WCA") is a Delaware limited partnership with its principal place of business at 712 Fifth Avenue, 21st Floor, New York, New York 10019. Upon information and belief, Defendant WCA was a Meridian insider as defined in 11 U.S.C. § 101(31) and applicable case law, and corresponding state laws including but not limited to Mich Comp. Laws § 566.31 and applicable case law and applicable New York case law. Defendant WCA had the power to make appointments to Meridian's board of directors and appointed affiliated board observers including Adam Gruber and Scott Spielvogel. Defendant WCA acted, in part, through the knowledge and actions of Defendants MacDonald and Swenson who served as members of Meridian's board of directors at the time of the 2004 Refinancing while at the same time acting as managing directors of WCA. As a result, WCA exerted control over Meridian's day-to-day business affairs, including all of its decisions with respect to Meridian's financing choices and the use of proceeds from the 2004 Refinancing. Defendant WCA received $324,224 in illegal payments from Meridian.

25.    Defendant Indosuez Capital Co-Invest Partners, L.P ("Indosuez") is a Delaware limited partnership with its principal place of business at 666 Third Avenue, New York, New York 10017. Upon information and belief, Defendant Indosuez was a Meridian insider as defined in 11 U.S.C. § 101(31) and applicable case law, and corresponding state laws including but not limited to Mich. Comp. Laws § 566.31 and applicable case law and applicable New York case law. Defendant Indosuez had the right to make appointments to Meridian's board of directors, made appointments of board observers which included Kathleen Sweeney and Thierry De Vergness and exerted control over Meridian's day-to-day business affairs, including all of its

decisions with respect to Meridian's financing choices and the use of proceeds from the 2004 Refinancing  Defendant Indosuez received $292,079 in illegal payments from Meridian

26.    Defendant SCP II Associates ("SCP II") is a Delaware general partnership with its principal place of business at Chez S1 Finance, 68 Rue du Faubourg Saint Honore, 75008 Paris, France  Upon information and belief, Defendant SCP II was a Meridian insider as defined in 11 U.S.C § 101(31) and applicable case law, and corresponding state laws including but not limited to Mich. Comp  Laws § 566.31 and applicable case law and applicable New York case law. Defendant SCP II had the right to make appointments to Meridian's board of directors and exerted control over Meridian's day-to-day business affairs, including all of its decisions with respect to Meridian's financing choices and the use of proceeds from the 2004 Refinancing. Defendant SCP II received $18,181 in illegal payments from Meridian.

27.    Defendants MetLife, Northwestern Mutual, Caisse, Skoog, Windward/Park, CSFB Holding, BACI, WCP, Suez Capital, WCA, Indosuez, and SCP II are referred to collectively as the "Institutional Insider Defendants."

28.    Before the 2004 Refinancing, the Institutional Insider Defendants and Defendants Jeff Anderson, Jon Baker, Robert Barton, Jose Garcia and H.H  Wacaser entered a Shareholder Agreement and subsequent amendments.  The Institutional Insider Defendants and affiliates they owned either directly or indirectly and Defendants Jeff Anderson, Jon Baker, Robert Barton, Jose Garcia and H.H. Wacaser acted together in concert to control Meridian's day-to-day affairs and capital structure.  As defined 11 U.S.C. § 101 and applicable case law, and corresponding state laws including but not limited to Mich. Comp  Laws § 566.31 and applicable case law and applicable New York case law, these Defendants are insiders and affiliates of Meridian because of the rights provided to them by the Shareholder Agreement and amendments.  These

15

Defendants through their collective stock ownership and in accordance with the terms of the

Shareholder Agreements acted in concert and controlled and owned directly and/or indirectly

well in excess of 20% of the voting power of Meridian

29.    The Shareholder Agreement and amendments provided the Institutional Insider

Defendants and other Defendants the power to appoint and remove board of directors and senior

executives of the company.  The Shareholder Agreement and amendments further provided the

Institutional Insider Defendants direct and indirect control over Meridian's refinancing of the

company as set forth in the Shareholder Agreement below with the power to:

(a)    hire, fire, remove or replace any senior executive of the Company;

(d)    sell, lease, mortgage, encumber of otherwise dispose of a material portion of the assets of the Company and its subsidiaries taken as a whole, other than as may be required under the Credit Agreement (as defined in the Implementation Agreement) or the Amended Subordinated Note Agreement (as defined in the Implementation Agreement);

(g)    enter into any agreement, contract, commitment or arrangement that if completed would be in contravention of any of the foregoing.

30.    Through the Shareholder Agreement and amendments the Institutional Insider

Defendants had a meeting of the minds and agreed to take actions necessary to accomplish their

objectives including massive payments to themselves through the 2004 Refinancing.

*The Director Defendants*

31.    Defendant John F. Maypole is an individual residing at, upon information and belief, 14 Sherwood Dr., Mountain Lakes, New Jersey 07046.  Defendant Maypole was a director of Meridian at the time of the 2004 Refinancing and therefore a Meridian insider as defined in 11 U.S.C. § 101(31) and applicable case law, and corresponding state laws including but not limited to Mich. Comp. Laws § 566.31 and applicable case law and applicable New York case law.  Upon information and belief, Defendant Maypole was also a partner in an entity controlled by Defendant WCP and received consulting fees from Defendant MetLife.  On information and belief, Defendant Maypole acted for Defendant MetLife as its agent in serving as a director of Meridian, acted in the scope of his employment by Defendant MetLife and for the actual and intended benefit of Defendant MetLife.  Upon information and belief, Defendant WPC invested $84,002.78 in Series B Notes on behalf of Defendant Maypole.

32.    Defendant Jeffrey Hodgman is an individual residing at, upon information and belief, 24 Hoyt Farm Dr., New Canaan, Connecticut 06840.  Defendant Hodgman was a director of Meridian at the time of the 2004 Refinancing and therefore a Meridian insider as defined in 11 U.S.C. § 101(31) and applicable case law, and corresponding state laws including but not limited to Mich. Comp. Laws § 566.31 and applicable case law and applicable New York case law.  Upon information and belief, at the same time, Defendant Hodgman was also an employee of Defendant MetLife.  On April 28, 2004, Mr. Hodgman was Executive Vice President of Investments for Metropolitan Life Insurance Company, where he had worked since 1966.  In all his actions as a director of Meridian, Mr. Hodgman acted for Defendant MetLife as its agent in the scope of his employment by Defendant MetLife and for the actual and intended benefit of Defendant MetLife.

17

33.    Defendant A. Kipp Koester is an individual residing at, upon information and belief, 5842 N. Maitland Ct., Milwaukee, Wisconsin 53217. Defendant Koester was a director of Meridian at the time of the 2004 Refinancing and therefore a Meridian insider as defined in 11 U.S.C. § 101(31) and applicable case law, and corresponding state laws including but not limited to Mich. Comp. Laws § 566.31 and applicable case law and applicable New York case law. Upon information and belief, Defendant Koester was a former employee of and remained subject to the influence and control of Defendant Northwestern Mutual. Upon information and belief, Defendant Koester acted for Defendant Northwestern Mutual as its agent and for the actual and intended benefit of Defendant Northwestern Mutual.

34.    Defendant Gary Swenson is an individual residing at, upon information and belief, 36 Game Cock Road, Greenwich, Connecticut 06830. Defendant Swenson was a director of Meridian at the time of the 2004 Refinancing and therefore a Meridian insider as defined in 11 U.S.C. § 101(31) and applicable case law, and corresponding state laws including but not limited to Mich. Comp. Laws § 566.31 and applicable case law and applicable New York case law. At the same time, Defendant Swenson was also a managing director of Defendant WCP. Upon information and belief, in all his actions as a director of Meridian, Defendant Swenson acted as agent for WCA, WCP, and Windward/Park within the scope of his agency and for the actual and intended benefit of WCA, WCP, and Windward/Park.

35.    Defendant Peter S. MacDonald is an individual residing at, upon information and belief, 530 East 86th Street, New York, New York 10028. Defendant MacDonald was a director of Meridian at the time of the 2004 Refinancing and therefore a Meridian insider as defined in 11 U.S.C. § 101(31) and applicable case law, and corresponding state laws including but not limited to Mich. Comp. Laws § 566.31 and applicable case law and applicable New York

18

case law  At the same time, Defendant MacDonald was also a managing director of Defendant

WCP  Upon information and belief, in all his actions as a director of Meridian, Defendant

MacDonald acted as agent for WCA, WCP, and Windward/Park within the scope of his agency

and for the actual and intended benefit of WCA, WCP, and Windward/Park.

.

     36     Defendant Thomas Graham is an individual residing at, upon information and

belief, 20 Trillium Lane, Pittsburgh, Pennsylvania 15238. Defendant Graham was a director of

Meridian at the time of the 2004 Refinancing and therefore a Meridian insider as defined in 11

U.S.C. § 101(31) and applicable case law, and corresponding state laws including but not limited

to Mich. Comp. Laws § 566 31 and applicable case law and applicable New York case law.

Upon information and belief, at the same time, Defendant Graham was also a partner in an entity

controlled by Defendant WCP  Upon information and belief, Defendant WCP invested

$239,708.00 in Series B Notes on behalf of Defendant Graham

     37     Defendant Donald A McKay is an individual residing at, upon information and

belief, 12011 Excelsior Way, Dallas, Texas 75230  Defendant McKay was a director of

Meridian at the time of the 2004 Refinancing and therefore a Meridian insider as defined in 11

U.S.C. § 101(31) and applicable case law, and corresponding state laws including but not limited

to Mich. Comp  Laws § 566 31 and applicable case law and applicable New York case law.

Upon information and belief, at the same time, Defendant McKay was also a partner in an entity

controlled by Defendant WCP

     38.     Defendant Henry A. Nickol is an individual residing at, upon information and

belief, 1505 Ashford Lane, Apt. 7, Birmingham, Michigan 48009. Defendant Nickol was a

director of Meridian at the time of the 2004 Refinancing and therefore a Meridian insider as

defined in 11 U S.C  § 101(31) and applicable case law, and corresponding state laws including

but not limited to Mich. Comp. Laws § 566.31 and applicable case law and applicable New York case law. Upon information and belief, at the same time, Defendant Nickol was also a partner in an entity controlled by Defendant WCP. Upon information and belief, Defendant WCP invested $124,616.71 in Series B Notes on behalf of Defendant Nickol.

39.     Defendant Craig Van Ess is an individual residing at, upon information and belief, 4221 Huntington Ave. NE, Grand Rapids, Michigan 49525. Defendant Van Ess was a director of Meridian at the time of the 2004 Refinancing and therefore a Meridian insider as defined in 11 U.S.C. § 101(31) and applicable case law, and corresponding state laws including but not limited to Mich. Comp. Laws § 566.31 and applicable case law and applicable New York case law. Upon information and belief, Defendant Van Ess acted for Defendants Skoog and Jack Skoog as their agent and for the actual and intended benefit of those Defendants.

40.     Defendant Gurminder S. Bedi is an individual residing at, upon information and belief, 6455 N. Sheridan Road, Chicago, Illinois 60626. Defendant Bedi was a director of Meridian at the time of the 2004 Refinancing and therefore a Meridian insider as defined in 11 U.S.C. § 101(31) and applicable case law, and corresponding state laws including but not limited to Mich. Comp. Laws § 566.31 and applicable case law and applicable New York case law.

41.     Defendant Thomas K. Walker is an individual residing at, upon information and belief, 10101 SE 30th St., Bellevue, Washington 98004. Defendant Walker was a director of Meridian at the time of the 2004 Refinancing and therefore a Meridian insider as defined in 11 U.S.C. § 101(31) and applicable case law, and corresponding state laws including but not limited to Mich. Comp. Laws § 566.31 and applicable case law and applicable New York case law.

42.     Defendant Robert H. Barton III is an individual residing at, upon information and belief, 711 Split Rail Drive, Brentwood, Tennessee 37027. Defendant Barton was a director of

Meridian at the time of the 2004 Refinancing and therefore a Meridian insider as defined in 11

U.S.C. § 101(31) and applicable case law, and corresponding state laws including but not limited

to Mich. Comp. Laws § 566.31 and applicable case law and applicable New York case law.

Upon information and belief, at the same time, Defendant Barton was also a partner in an entity

controlled by Defendant WCP.

     43.    Defendant H.H. Wacaser is an individual residing at, upon information and belief,

370 Lower Station Camp Creek Road, Gallatin, Tennessee 37066  Defendant Wacaser was an

officer and director of Meridian at the time of the 2004 Refinancing and therefore a Meridian

insider as defined in 11 U.S.C. § 101(31) and applicable case law, and corresponding state laws

including but not limited to Mich. Comp. Laws § 566.31 and applicable case law and applicable

New York case law. Defendant Wacaser served as the Meridian's President and Chief Executive

Officer in 2004. Between 1997 and 2002, Defendant Wacaser served as Meridian's Executive

Vice President of Operations.

     44    Defendants Maypole, Hodgman, Koester, Swenson, MacDonald, Graham,

McKay, Nickol, Van Ess, Bedi, Walker, Barton and Wacaser are referred to collectively as the

"Director Defendants".

### *The Individual Insider Defendants*

     45    Defendant Jon F. Baker is an individual residing at, upon information and belief,

724 N. Glengarry Road, Bloomfield Hills, Michigan 48301. Defendant Baker is a former

Executive Vice President of Engineering and Product Development for Meridian. Defendant

Baker was an officer of Meridian at the time of the 2004 Refinancing and therefore a Meridian

insider as defined in 11 U.S.C § 101(31) and applicable case law, and corresponding state laws

including but not limited to Mich  Comp. Laws § 566.31 and applicable case law and applicable

21

New York case law. Defendant Baker was an officer of Meridian at the time of the 2004 Refinancing, and he left the company in June 2004 after the refinancing was completed.

46.    Defendant Jose R. Garcia is an individual residing at, upon information and belief, 5319 Willow Highway, Grand Ledge, Michigan 48837  Defendant Garcia was the Manager/Director of Tooling & Manufacturing for Meridian  Defendant Garcia was an officer of Meridian at the time of the 2004 Refinancing and therefore a Meridian insider as defined in 11 U S C. § 101(31) and applicable case law, and corresponding state laws including but not limited to Mich. Comp. Laws § 566 31 and applicable case law and applicable New York case law. Defendant Garcia was an officer of Meridian at the time of the 2004 Refinancing, and he left the company in September 2006 after the refinancing was completed.

47.    Defendant Jeffrey A  Anderson is an individual residing at, upon information and belief, 185 E  Huron Drive, Belleville, Michigan 48111. Defendant Anderson was Senior Vice President of Product Engineering for Meridian. Defendant Anderson was a Meridian insider because he was an officer of Meridian at the time of the 2004 Refinancing as defined in 11 U.S C. § 101(31) and applicable case law, and corresponding state laws including but not limited to Mich. Comp. Laws § 566.31 and applicable case law and applicable New York case law Defendant Anderson was an officer of Meridian at the time of the 2004 Refinancing, and he left the company in August 2006 after the refinancing was completed.

48.    Defendant Jack Skoog is an individual residing at, upon information and belief, 326 Seabreeze Dr., Marco Island, Florida 34145. Defendant Jack Skoog was a Meridian insider as defined in 11 U.S.C. § 101(31) and applicable case law, and corresponding state laws including but not limited to Mich. Comp. Laws § 566.31 and applicable case law and applicable New York case law. Defendant Jack Skoog acted, in part, through the knowledge and actions of

22

Defendant Craig Van Ess, who served on Meridian's board of directors at the time of the 2004 Refinancing. Upon information and belief, Defendant Jack Skoog, through Defendant Skoog, had the right to make appointments to Meridian's board of directors and exercised considerable influence over Meridian.

49. Defendant Dean Vanek is an individual residing at, upon information and belief, 540 Revere Lane, Palatine, Illinois 60067. Defendant Vanek was an officer of Meridian at the time of the 2004 Refinancing and therefore a Meridian insider as defined in 11 U.S.C. § 101(31) and applicable case law, and corresponding state laws including but not limited to Mich. Comp. Laws § 566.31 and applicable case law and applicable New York case law. Defendant Vanek was also a partner in an entity controlled by Defendant WCP.

50. Defendants Baker, Garcia, Anderson, Jack Skoog and Vanek are collectively referred to as the "Individual Insider Defendants."

*Arranger Defendants*

51. Certain Defendants were investment banks who facilitated the looting of Meridian by the other Defendants in numerous ways described in detail below.

52. Defendant Credit Suisse First Boston (USA), Inc. is a Delaware corporation with its principal place of business at 11 Madison Avenue, New York, New York, 10010. Defendant Credit Suisse First Boston has its principal place of business at 11 Madison Avenue, New York, New York 10010. Credit Suisse First Boston (USA), Inc. and Credit Suisse First Boston are collectively referred to as "CSFB". Defendant CSFB was paid $17,087,742.00 in connection with Defendant CSFB's actions in arranging the 2004 Refinancing and Revolver Fee.

53. Defendant Goldman Sachs is a Bermuda limited partnership with its principal place of business at 85 Broad Street New York, New York 10004. Goldman Sachs was paid

23

$3,813,122.52 in connection with Defendant Goldman Sachs's actions in arranging the 2004

Refinancing and Revolver Fee.

54.     Defendants CSFB and Goldman Sachs are referred to as the "Arranger

Defendants."

## THE LOOTING OF MERIDIAN

55     The looting of Meridian was the last chapter in a failed attempt to build a leading

automotive supplier through an acquisition spree led by WCA and WCP, and financed largely by

the Institutional Insider Defendants. Meridian began on April 30, 1997, when a group of

investors led by Defendant WCP acquired 74% of the outstanding stock through a leveraged

recapitalization of a company called American Bumper & Mfg. Co., a company founded by

Defendant Jack Skoog, and thereafter formed Meridian. As part of the leveraged

recapitalization, American Bumper issued Defendant Skoog, an unsecured subordinated note in

the principal amount of $15 million (the "Skoog Note")

56.     From October 1998 through July 2000 Meridian engaged in several acquisitions

of other automotive component manufacturers  In order to fund the acquisition spree, Meridian

incurred approximately $321 million in debt under an existing credit facility with Bank of

America. Meridian also issued approximately $65 million in 12% unsecured subordinated notes

and approximately $155 million in equity to the Institutional Insider Defendants and the

Individual Insider Defendants.

57.     The Institutional Insider Defendants had the power to appoint, and did appoint,

directors to Meridian's board of directors. In addition, the Institutional Insider Defendants

exercised so-called "observation rights" at Meridian's board meetings  But the persons who

exercised the "observation rights" on behalf of the Institutional Insider Defendants were not

24

merely observers, but rather, active participants in board meetings  Upon information and belief,

when Meridian's board of directors excused Meridian's senior management to go into closed

session, the board observers remained and participated in discussions as if they were, in fact,

directors themselves.   The board observers even served on committees set up by the board of

directors  The Institutional Insider Defendants controlled Meridian through their board

appointments and observation rights making sure that Meridian's directors met their demands.

There were essentially no limits on the power of the Institutional Insider Defendants to

participate in the management of Meridian's affairs.  By virtue of their ownership of Meridian

and their power over Meridian's board of directors, Meridian's directors did exactly what the

Institutional Insider Defendants demanded.

58.    Following the last acquisition directed by Defendant WCP in 2000. Meridian fell

on hard times  Bank of America classified Meridian as a distressed credit and amended

Meridian's credit agreement seven times due to Meridian's poor performance

59.    In March 2001, Meridian refinanced its then-outstanding subordinated notes.  At

the time of the refinancing in 2001, the principal amount of the 12% unsecured subordinated

notes had exploded to $102,409,639 12.  As part of the refinancing in 2001, Meridian purported

to convert (i) $74,880,166 24 of the 12% unsecured subordinated notes into new Series A1

12.125% unsecured subordinated notes and (ii) $27,529,472.88 of the 12% unsecured

subordinated notes into new Series A2 13 0% unsecured subordinated notes (the Series A1 and

Series A2 notes, together, the "Series A Notes").

60    Upon information and belief, Meridian also raised $40,000,000 in additional

equity from certain Institutional Insider Defendants, but this was later purportedly converted to

debt in the form of newly issued Series B1 and Series B2 subordinated notes (the "Series B

Notes") with a total principal amount of $40,000,000  Although the Series B notes were ostensibly secured, they were deeply subordinated to all of Meridian's bank debt.

61      Together, the Series A Notes, Series B Notes and the Skoog Note are referred to as the "mezzanine debt," a term that refers to unsecured, high-yield, subordinated debt that represents a claim on a company's assets that is senior only to that of a company's shareholders. As discussed below, the Defendants caused Meridian to characterize the Series A Notes and Series B Notes as "mezzanine debt", but many facts suggest that the "mezzanine debt" was actually equity and not debt.  The Series A and Series B Notes were deeply subordinated and the Series A Notes were unsecured.  The Skoog Note was also deeply subordinated and unsecured

62      The "mezzanine debt" had a maturity date in 2007, more than three years later than the date that Defendants caused Meridian to pay down the Notes, and over two years later than the date that Meridian filed for bankruptcy  Upon information and belief, Meridian had no obligation to pay any money, whether "principal" or "interest", to the holders of the Notes at the time of the 2004 Refinancing  In fact by paying down the "mezzanine debt," Meridian was charged with significant prepayment penalties.

63.     As already seen from the closing dinner presentation, Defendant CSFB considered the payments on the "mezzanine debt" as a "dividend."  Upon information and belief, at least one Meridian officer, Meridian's former Chief Financial Officer, told customers, and bank lenders that the payment to Insider Defendants was a dividend.  Meridian's former Chief Financial Officer also treated the "mezzanine debt" as functionally equivalent to equity and the $60 million payment to Insider Defendants was like a dividend for an equity investment At the time the transfers were made, the "mezzanine debt" was not entitled to receive cash interest payments  Instead, interest was paid by issuing additional notes or adding the interest to

the principal of the existing notes. Meridian had no obligations to make any payments to holders of "mezzanine debt" until March 2007.

64      On August 20, 2002, Meridian filed a registration statement for an initial public offering in order to pay down its debts and to provide existing Institutional Insider Defendants an exit strategy from their struggling investments  However, on February 25, 2003, Meridian filed a registration withdrawal request to withdraw its registration statement, claiming that "current market conditions do not support a public offering of the Company's common stock at this time."

65.      Frustrated with the failed IPO attempt, the Institutional Insider Defendants demanded that the board of directors look for another exit strategy. In compliance with the Institutional Insider Defendants' demands, at a board meeting in February 2003, the board and board observers discussed options to provide an exit strategy for the existing shareholders from their investments in Meridian

66      One such option discussed at the February 2003 board meeting was a deal with LDM Technologies, another supplier to the automotive industry  The proposed deal with LDM also became fodder for jokes by CSFB at the closing dinner. As shown on the slide below from the dinner presentation, the investment bankers again thought it funny that the Institutional Insider Defendants wanted to pay themselves a dividend:

CONFIDENTIAL

## Top 5 Reasons Why Windward Wanted To Do LDM



5.    Yet another excuse to pay a dividend to the Mezz holders

4.    Swenson needs a new story

3.    Conservative EBITDA synergies of $175 million

2.    Pete's a "deal guy"

1.    League table credit

*"No Whining"*

4

67    In December 2003, the Institutional Insider Defendants demanded that the board

of directors hire the elite consulting firm, McKinsey & Co. ("McKinsey"), to provide an outside

analysis of Meridian  As usual, the Director Defendants complied with the demands of the

Institutional Insider Defendants and hired McKinsey.  The board even went a step further setting

up a Steering Committee to oversee McKinsey and McKinsey's recommendations related to

Meridian's capital structure.  Not surprisingly the Steering Committee included the board

"observers" as set forth below in Meridian's Board Minutes for December 2003:

> **BE IT RESOLVED,** upon thorough discussion and review, the formation of a Steering Committee consisting of Messrs. Wacaser, Freudenstien, Wegener, Swenson and Houle and Ms. Garrett to oversee the McKinsey & Company engagement and develop the final recommendation(s) was, upon a motion duly made, seconded and carried, unanimously approved.

68.    On January 8, 2004 and January 16, 2004, McKinsey reported to the Steering Committee that Meridian was insolvent as set forth below. McKinsey's presentation listed the book value of the liabilities of Meridian as $710 million and the book value of the shareholder equity in Meridian as negative $153 million  The debt to equity ratio is so great as to be undefinable. This was a strong indication that Meridian was undercapitalized and had little hope of ever paying off the "mezzanine debt"



69      On numerous other occasions after the Steering Committee meetings in January

2004, the Institutional Insider Defendants, certain of the Individual Insider Defendants, the

Director Defendants and Arranger Defendants were informed by both third party consulting

firms and Meridian itself, that the company was insolvent.

70.      On February 4, 2004, Defendant Wacaser informed the Director Defendants and

thereby the Institutional Insider Defendants that McKinsey had determined that Meridian was

insolvent. On February, 11, 2004, McKinsey told these Defendants in an informational meeting

that Meridian was insolvent  On February 18, 2004, the Director Defendants, Institutional

Insider Defendants and Arranger Defendants were presented with McKinsey's analysis at a

board meeting. In April 2004 at Meridian's board meeting, these same Defendants were again

told that McKinsey had determined Meridian was insolvent  Meridian's insolvency was well known by these Defendants before the 2004 Refinancing was completed

71.    Upon information and belief, in April 2004, Defendant Vanek also knew that Meridian was insolvent.  This is evidenced by his hand-written notes on a draft solvency certificate related to the 2004 Refinancing indicating that Meridian's representation that it was solvent on April 28, 2004 was "not true."



> *We have negative equity*      *not true*
>
> 1.    On the Effective Date, after giving effect to the Transactions, the fair value of the assets of the Borrower and its Subsidiaries (taken as a whole), at a fair valuation, will exceed their debts and liabilities, ~~subordinated~~, contingent or otherwise.

72.    On April 28, 2004, the Institutional Insider Defendants, Director Defendants, Arranger Defendants and Defendant Vanek were informed by another third party adviser, Stout Risius Ross, that on that date Meridian was insolvent with reported stockholder equity of negative $196 4 million

73.    Upon information and belief, Meridian's creditors, including its unsecured creditors, were not provided with the same information as the Institutional Insider Defendants, Director Defendants, Defendant Vanek and the Arranger Defendants.  The analysis done by McKinsey setting forth Meridian's insolvency was shared with the Director Defendants, who were told by Defendant Wacaser in a letter dated February 4, 2004 to keep that fact a secret:

> Please note that this material is very sensitive in nature and should not be distributed or duplicated.

74.    Facing the prospect of zero recovery on their investment in an insolvent company – or, at best, sharing Meridian's asset value with Meridian's innocent creditors – the Institutional Insider Defendants looked for an opportunity to pull assets out of the insolvent Meridian while hoping to delay bankruptcy for at least long enough to avoid application of the very laws asserted against them here  The Institutional and Individual Insider Defendants sought a refinancing that would simultaneously (1) pay back Bank of America and delay Meridian's bankruptcy filing; and (2) strip $80 million out of Meridian for themselves. In pursuing the second goal, the Insider Defendants acted with the actual intent to hinder, delay, and defraud Meridian's creditors

75.    The Institutional Insider Defendants used their control of Meridian to force the board to condition a proposed refinancing on an $80 million payment to the holders of the "mezzanine debt", including themselves and certain of the Individual Insider and Director Defendants. Defendant WCP, one of the Institutional Insider Defendants, had an additional incentive for the refinancing. Defendant WCP hoped to collect fees it had charged Meridian, but that had remained unpaid, from the proceeds of any financing  WCP's two managing directors, Defendants Swenson and McDonald, were also Meridian directors

76.    Upon information and belief, the request to pay $80 million to the holders of the "mezzanine debt" did not originate with senior management of Meridian. Rather the demand for this massive payment came from an interested Director Defendant and a partner in the Windward entities that held "mezzanine debt."

77.    Upon information and belief, the Director Defendants were so beholden to the Institutional Insider Defendants that no director raised an objection to the $80 million payment to insiders  On March 19, 2004, a member of Meridian's senior management described the 2004 Refinancing to Defendant Wacaser as the company being held captive.

78    On information and belief, the Institutional Insider Defendants and Director Defendants were so intent on looting the assets of the company that they either purposely or by gross negligence ignored the fact that the vast majority of the "mezzanine debt" was unsecured and/or worthless equity. The Director Defendants, as controlled by the Institutional Insider Defendants, assumed all of the "mezzanine debt" was secured. In making the dividend payment to certain of the Institutional Insider, Individual Insider and Director Defendants, the Director Defendants turned a blind eye to the facts by failing to properly inform themselves about the most basic characteristics of the "mezzanine debt."

79.    On March 10, 2004, Meridian executed an Authorization Letter sent to Defendant CSFB at 11 Madison Avenue, New York, NY 10010-3629 and Defendant Goldman Sachs at 85 Broad Street, New York, NY 10004 asking those Defendants to distribute a confidential information memorandum explaining the proposed 2004 Refinancing to prospective lenders Upon information and belief, those Arranger Defendants sent the memorandum to prospective lenders from their respective New York addresses  The confidential information memorandum also contained a form commitment letter that was to be returned by prospective lenders that wanted to participate in the 2004 Refinancing to Defendant CSFB's office at 11 Madison Avenue, New York, NY 10010-3629. It also contained contact information for individuals working for the Arranger Defendants on the 2004 Refinancing. Of the 26 such individuals listed, 25 had offices in the city of New York and contact numbers in the 212 area code of the city of New York.

80    On March 23, 2004 at Defendant CSFB's offices in the city of New York, the Arranger Defendants met with prospective lenders interested in participating in the 2004 Refinancing

81.    Feedback from prospective lenders indicated that the market was concerned about the Institutional Insider Defendants' and Director Defendants' $80 million cash grab. In particular, Defendants MacDonald, Windward/Park, WCP and WCA were told on March 31, 2004 by Meridian's former Chief Financial Officer that prospective lenders Bank of Nova Scotia, Comerica and Fifth Third Bank were all concerned about the $80 million payment. Meridian's former Chief Financial Officer instructed Defendant MacDonald to inform the other Institutional Insider Defendants about the market's negative reaction. On April 15, 2004, the Director Defendants and Institutional Insider Defendants were informed by Meridian's senior management of the market's negative reaction "to funding $80 million proceeds to the mezz."

82.    Ultimately, the Institutional Insider Defendants begrudgingly scaled back their demands from $80 million to about $60 million, after the Arranger Defendants reported difficulty in marketing a refinancing that required Meridian to "pay the mezz holders a massive dividend."

83.    Subsequently, the 2004 Refinancing was implemented through a series of agreements. Chief among these agreements were the First Lien Credit Agreement, the Second Lien Credit Agreement, and the Fourth Amended and Restated Subordinated Note Agreement, all dated as of April 28, 2004. Each of these agreements is governed by the laws of the State of New York. In addition, the parties to the Fourth Amended and Restated Subordinated Note Agreement, which include Defendants MetLife, Northwestern Mutual, Caisse, Windward/Park, CSFB Holding, BACI, Suez Capital, WCA, Indosuez, SCP II, Baker, Wacaser, Garcia, Anderson and Barton, agreed that:

ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST THE PARTIES ARRISING OUT OF OR RELATING TO THIS AGREEMENT, OR ANY OBLIGATIONS HEREUNDER, MAY BE BROUGHT IN ANY STATE OR

34

FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE,
COUNTY AND CITY OF NEW YORK. BY EXECUTING AND
DELIVERING THIS AGREEMENT, THE PARTIES IRREVOCABLY (I)
ACCEPT GENERALLY AND UNCONDITIONALLY THE NONEXCLUSIVE
JURISDICTION AND VENUE OF SUCH COURTS; (II) WAIVE ANY
OBJECTIONS WHICH SUCH PARTY MAY NOW OR HEREAFTER HAVE
TO THE LAYING OF VENUE OF ANY OF THE AFORESAID ACTIONS OR
PROCEEDINGS AIRISING OUT OF OR IN CONNECTION WITH THIS
AGREEMENT BROUGHT IN THE COURTS REFERRED TO IN CLAUSE (I)
ABOVE AND HEREBY FURTHER IRREVOCABLY WAIVE AND AGREE
NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT SUCH ACTION
OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN
BROUGHT IN AN INCONVENIENT FORUM; (III) AGREE THAT SERVICE
OF ALL PROCESS IN ANY SUCH COURT MAY BE MADE BY
REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO
SUCH PARTY AT THEIR RESPECTIVE ADDRESSES PROVIDED IN
ACCORDANCE WITH SECTION 12 1; (IV) AGREE THAT SERVICE AS
PROVIDED IN CLAUSE (III) ABOVE IS SUFFICIENT TO CONFER
PERSONAL JURSIDICTION OVER SUCH PARTY IN ANY SUCH
PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES
EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT; AND (V)
AGREE THAT THE PROVISIONS OF THIS SECTION 12.11 RELATING TO
JURISDICTION AND VENUE SHALL BE BINDING AND ENFORCEABLE
TO THE FULLEST EXTENT PERMISSIBLE UNDER NEW YORK
GENERAL OBLIGATIONS LAW SECTION 5-1402 OR OTHERWISE.

Defendants MetLife, Northwestern Mutual, Caisse, Windward/Park, CSFB Holding, BACI, Suez

Capital, WCA, Indosuez, SCP II, Baker, Wacaser, Garcia, Anderson and Barton received

payments as holders of "mezzanine debt" pursuant to the Fourth Amended and Restated

Subordinated Note Agreement.

      84     Upon information and belief, after arranging the 2004 Refinancing and the $60

million payment to mezzanine holders, CSFB and other Defendants joked at the closing

presentation about Meridian's 2003 EBITDA figures. CSFB and the other investment bankers

deemed it humorous that Meridian's EBITDA figures and projections varied wildly:



85      Despite extensive knowledge that Meridian was insolvent, undercapitalized and unable to ultimately pay its debts, the Director Defendants, Institutional Insider Defendants, Individual Insider Defendants, and Arranger Defendants completed the 2004 Refinancing. Upon information and belief, the closing of the 2004 Refinancing took place on April 28, 2004 in New York City. Meridian raised $485 million in new credit facilities, comprised of (i) a $75 million first lien revolving loan, (ii) a $235 million first lien term loan, and (iii) a $175 million second lien term loan. Meridian used $337 million in proceeds from these new facilities to repay its existing secured bank debt under the Bank of America credit facility.

86.    On or about April 28, 2004, Meridian used over $21 million in proceeds from these new facilities to pay transaction fees to, among others, Defendants CSFB, Goldman Sachs and WCP.

87    On or about April 28, 2004, Meridian used $53 million in proceeds from these new facilities to pay down mezzanine debt to the Institutional Insider Defendants and Individual Insider Defendants as set forth below:

| Payments to the Institutional Insider Defendants on the Series A and B Notes | |
|---|---|
| MetLife | $20,456,944.00 |
| Northwestern Mutual | $16,775,525.36 |
| Caisse | $7,171,046.58 |
| Windward/Park | $4,244,663.15 |
| CSFB Holding | $2,342,186.04 |
| BACI | $1,146,549.85 |
| Suez Capital | $412,521.28 |
| WCA | $324,224.12 |
| Indosuez | $292,078.90 |
| SCP II | $18,180.74 |
| Payments to the Individual Insider Defendants on the Series B Notes | |
| Baker | $19,341.57 |
| Garcia | $6,927.92 |
| Anderson | $2,939.99 |
| Payments to the Director Defendants on the Series B Notes | |
| Barton | $54,450.54 |
| Wacaser | $10,560.22 |
| | |
| **TOTAL** | **$53,278,140.26** |

88.    On or about April 28, 2004, Meridian paid $6.7 million to Defendant Skoog to pay down and later retire the Skoog Note and also paid Defendant Jack Skoog $175,000.00 in fees (the "Jack Skoog Fees") pursuant to Amendment No. 2 to Consulting Agreement, dated as of April 2004, between Meridian and Jack Skoog. Upon information and belief, Meridian was

severely harmed by the actions of Jack Skoog that cost Meridian much more than it received in exchange for the minimal work performed by Jack Skoog  Meridian received little to no net value in return for the payment of $175,000 00 on or about April 28, 2004

89    On or about April 28, 2004, Meridian paid Defendant WCP $580,228 21 in "management fees" (the "WCP Management Fees"). Upon information and belief, Meridian was severely harmed by the actions of WCP that cost Meridian much more than it received in exchange for the work performed by WCP. Meridian received little to no net value in return for the payment of $580,228.21 on or about April 28, 2004.

90.    On or about April 28, 2004, upon information and belief, Meridian paid Defendant CSFB $17,087,742.00 in connection with Defendant CSFB's actions in arranging the 2004 Refinancing and Revolver Fee. Upon information and belief, Meridian was severely harmed by the actions of CSFB that cost Meridian much more than it received in exchange for the work performed by CSFB  Meridian received little to no net value in return for the payment of $17,087,742.00 on or about April 28, 2004.

91.    On or about April 28, 2004, upon information and belief, Meridian paid Defendant Goldman Sachs $3,813,122.52 in connection with Defendant Goldman Sachs' actions in arranging the 2004 Refinancing  Upon information and belief, Meridian was severely harmed by the actions of Goldman Sachs that cost Meridian much more than it received in exchange for the work performed by Goldman Sachs. Meridian received little to no net value in return for the payment of $3,813,122 52 on or about April 28, 2004

92.    Upon information and belief, in acting as arranger for the 2004 Refinancing, Defendant Goldman Sachs was focused on generating future business for itself rather than providing sound advice to Meridian. On April 28, 2004, Bill Jacobs of Defendant Goldman

Sachs corresponded with Meridian stating that the bigger picture in refinancing Meridian was ultimately an initial public offering. He further stated that Defendant Goldman Sachs by completing the 2004 Refinancing could position itself to advise Meridian on an IPO. Mr. Jacobs further stated that CSFB did not do a satisfactory job for Meridian in the 2004 Refinancing. Upon information and belief, Defendant Goldman Sachs overlooked Meridian's insolvency and undercapitalization because it was too busy trying to position itself for the massive fees that could be achieved if it was chosen as future IPO advisor to Meridian.

93    The following Director Defendants and Individual Insider Defendants received the additional payments set forth below in board fees, consulting agreement fees, bonuses, excessive salary, Supplemental Executive Retirement Plan ("SERP") payments and 401K contributions and expenses paid by Meridian within one year of Meridian filing for bankruptcy. Upon information and belief, Meridian was severely harmed by the actions of these Defendants that cost Meridian much more than it received in exchange for the minimal work performed by them. Meridian received little to no net value in return for the payments set forth below:

| | |
|---|---|
| Wacaser | $1,180,404.71 |
| Barton | $695,231.67 |
| Vanek | $494,284.22 |
| Jack Skoog | $175,000.00 |
| McKay | $59,329.89 |
| Bedi | $78,348.98 |
| Walker | $47,066.05 |
| Maypole | $46,216.52 |
| Nickol | $45,833.77 |
| Graham | $37,729.36 |
| Hodgman | $1,487.20 |
| Van Ess | $2,500.00 |
| | |
| **Total** | **$2,863,432.37** |

94    The amounts set forth in the above chart in ¶93 include the following board fees

which Meridian paid to the following Director Defendants based on antecedent debts under their

employment or consulting agreements all within one year of Meridian filing bankruptcy

| | |
|---|---|
| Jack Skoog | $175,000.00 |
| McKay | $59,329.89 |
| Bedi | $78,348.98 |
| Walker | $47,066.05 |
| Maypole | $46,216.52 |
| Nickol | $45,833.77 |
| Graham | $37,729.36 |
| Hodgman | $1,487.20 |
| Van Ess | $2,500.00 |

95.    The amounts set forth in the above chart in ¶93 include the following SERP

payments which Meridian paid to the following Defendants based on antecedent debts under

their employment agreements on the following dates all within one year of Meridian filing for

bankruptcy:

| Defendant | Date Paid | SERP Amount |
|---|---|---|
| Wacaser | 4/5/2005 | $253,202.68 |
| Barton | 1/18/2005 | $411,289.82 |
| Vanek | 4/15/2005 | 72,526.00 |

96    The amounts set fourth in the above chart in ¶93 include the following salaries

and year end bonuses which Meridian paid to the following Defendants based on antecedent

debts under their employment agreements on the following dates all within one year of Meridian

filing for bankruptcy:

| Defendant | Date Paid | Total Salary | Bonus |
|---|---|---|---|
| Wacaser | Numerous dates including 4/5/2005 | $563,542 | $250,000 |
| Barton | Numerous dates including 1/18/2005 | $211,948 | |
| Vanek | Numerous dates including 4/15/2005 | $364,601 | $50,000 |

## CAUSES OF ACTION

**First Claim for Relief**
**Unlawful Distribution In Violation Of Mich. Comp. Law § 450.1345**
(Against Defendants MetLife, Northwestern Mutual, Caisse, Skoog, Windward/Park, CSFB
Holding, BACI, Suez Capital, WCA, Indosuez, SCP II, Baker, Wacaser, Garcia, Anderson and
Barton)

97.     Plaintiff incorporates all preceding paragraphs of this Complaint as if fully set

forth herein

98      Meridian was insolvent at the time of the 2004 Refinancing. Immediately before

and after the consummation of the 2004 Refinancing, and before and after giving effect to

payments made to the holders of "mezzanine debt" and the Arranger Defendants, (a) the fair

value of Meridian's assets, on a consolidated basis, at a fair valuation, was less than Meridian's

debts and liabilities. subordinated, contingent or otherwise; (b) the present fair saleable value of

Meridian's property, on a consolidated basis, was less than the amount that was required to pay

the probable liability on Meridian's debts and other liabilities, subordinated. contingent or

otherwise, as such debts and other liabilities would become absolute and matured; (c) Meridian,

on a consolidated basis, was unable to pay its debts and liabilities, subordinated, contingent or

otherwise, as such debts and liabilities would become absolute and matured; and (d) Meridian,

on a consolidated basis, had unreasonably small capital with which to conduct the business in

which it was engaged as such business was conducted before and proposed to be conducted

following the 2004 Refinancing. Meridian had no net assets and no capital surplus

99      Despite Meridian being insolvent, on April 28, 2004, the Director Defendants

voted to approve and issue distributions totaling approximately $60 million to Defendants

MetLife, Northwestern Mutual, Caisse, Skoog, Windward/Park, CSFB Holding, BACI, Suez

Capital, WCA, Indosuez, SCP II, Baker, Wacaser, Garcia, Anderson and Barton. These

Defendants violated state law by engaging in unlawful distributions in violation of Mich. Comp. Laws § 450.1345.

100    The Institutional Insider Defendants or their affiliates and Defendants Baker, Wacaser, Garcia, Anderson and Barton directly or indirectly owned shares of Meridian on April 28, 2004.

101.    On information and belief, Defendants MetLife, Northwestern Mutual, Caisse, Skoog, Windward/Park, CSFB Holding, BACI, Suez Capital, WCA, Indosuez, SCP II, Baker, Wacaser, Garcia, Anderson and Barton had actual knowledge that Meridian was insolvent when their portions of the distribution were paid to them and had actual knowledge of its unlawful nature.

102.    Plaintiff is entitled to recover these unlawful distributions to these Defendants, including interest and costs and such other and further relief as is just and appropriate.

103.    Plaintiff is also entitled to recover the unlawful distributions from the Director Defendants, including Defendant Barton and Defendant Wacaser, who are personally liable for the unlawful distribution.

### Second Claim for Relief
### Breach of Fiduciary Duty of Loyalty
(Against Director Defendants and Defendant Vanek)

104    Plaintiffs incorporate all preceding paragraphs of this Complaint as if fully set forth herein.

105    Director Defendants and Defendant Vanek owed Meridian fiduciary duties of loyalty. However, Director Defendants and Defendant Vanek violated their duties of loyalty by utterly abandoning Meridian's interest and attending only to the interests of the Institutional Insider Defendants and themselves.

106.   Exercising a duty of loyalty only to the Institutional Insider Defendants and not to Meridian, the Director Defendants and Defendant Vanek intentionally failed to inform themselves of available material information by failing to undertake even the most basic steps to ascertain and verify that the company was solvent at the time it made massive payments to the holders of the "mezzanine debt" and the Arranger Defendants.

107    In fact, as the Director Defendants and Defendant Vanek either actually knew (based, in part, on the work of McKinsey and others described above) or feared they would discover if they checked, immediately before and after the consummation of the 2004 Refinancing, and before and after giving effect to payments made to the holders of the "mezzanine debt" and the Arranger Defendants, (a) the fair value of Meridian's assets, on a consolidated basis, at a fair valuation, was less than Meridian's debts and liabilities, subordinated, contingent or otherwise; (b) the present fair saleable value of Meridian's property, on a consolidated basis, was less than the amount that was required to pay the probable liability on Meridian's debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities would become absolute and matured; (c) Meridian, on a consolidated basis, was unable to pay its debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities would become absolute and matured; and (d) Meridian, on a consolidated basis, had unreasonably small capital with which was conducted before and proposed to be conducted following the 2004 Refinancing  Meridian had no net assets and no capital surplus

108.   Exercising a duty of loyalty only to the Institutional Insider Defendants and not to Meridian, the Director Defendants and Defendant Vanek also intentionally failed to inform themselves of available material information by failing to undertake even the most basic review of documentation that would have established that the vast majority of the so-called "mezzanine

debt" was unsecured. In their effort to facilitate payments to the holders of the "mezzanine debt", the Director Defendants and Defendant Vanek intentionally failed to take any steps to properly inform themselves about the unsecured status of much of the mezzanine debt.

109.    Exercising a duty of loyalty only to the Institutional Insider Defendants and not to Meridian, the Director Defendants and Defendant Vanek also failed to preserve Meridian's assets for the benefit of itself and all its stakeholders and claimants, and instead intentionally dissipated, intentionally fraudulently conveyed and wasted the Meridian assets they transferred to the holders of the "mezzanine debt" and the Arranger Defendants. The Director Defendants and Defendant Vanek intentionally squandered Meridian's assets on payments to the holders of the "mezzanine debt" and the Arranger Defendants that served no corporate purpose to Meridian and for which Meridian received no consideration.

110    In purposefully giving their loyalty to the Insider Defendants and withdrawing it from Meridian, the Director Defendants and Defendant Vanek engaged in intentional violations of their duties of loyalty that amounted to looting of the corporation's assets for the benefit of themselves and the other Defendants. In so doing, these Defendants intentionally deepened Meridian's insolvency to the detriment of Meridian's corporate value.

111.    The Director Defendants and Defendant Vanek profited from the 2004 Refinancing. Defendant Barton, a Director Defendant, received payments as a holder of "mezzanine debt." On information and belief, numerous Director Defendants, including Defendants Barton, Swenson, MacDonald, Maypole, Graham, McKay and Nickol, and Defendant Vanek, had conflicts of interest as both fiduciaries of Meridian and employees, consultants or paid advisors of Institutional Insider Defendants including but not limited to Defendants MetLife, Northwestern Mutual, CSFB, Caisse and one or more of WCA, WCP,

and/or Windward/Park. These directors were beholden to and controlled by the Institutional Insider Defendants. They had conflicts of interest and engaged in self-dealing.

112.    A majority of the board of directors that approved the 2004 Refinancing and the wasteful payments to the holders of "mezzanine debt" and Defendant Arrangers did so only as a result of their disloyalty to Meridian and their above-described conflicts of interest. This majority included Defendants Barton, Swenson, MacDonald, Maypole, Graham, McKay, Nickol, Kestor, Van Ess, and Wacaser. Of this majority, Defendants Barton and Wacaser actually received payments as a holder of "mezzanine debt" Of this majority, the following received payments as members of one or more of WCA, WCP, and/or Windward/Park: Defendants Barton, Swenson, MacDonald, Maypole, Graham, McKay and Nickol. Of this majority, the remaining Director Defendants, Hodgmen and Maypole, Swenson and MacDonald, Kestor, Van Ess, were completely dominated and controlled by MetLife, Northwestern Mutual, Windward, or Skoog and made decisions out of loyalty to persons and entities other than Meridian.

113    The breaches of fiduciary duties of loyalty by the Director Defendants and Defendant Vanek were the direct and proximate cause of damages to Meridian and its creditors.

114.    Plaintiff is entitled to recover damages for these breaches of fiduciary duties including interest and costs and such other and further relief as is just and appropriate

### Third Claim for Relief
### Aiding and Abetting Breaches of Fiduciary Duties
(Against the Institutional Insider Defendants and the Arranger Defendants)

115.    Plaintiffs incorporate all preceding paragraphs of this Complaint as if fully set forth herein.

116    As described above, the Director Defendants and Defendant Vanek breached their fiduciary duties of loyalty to Meridian. Upon information and belief, the Institutional Insider

45

Defendants and the Arranger Defendants had actual knowledge of these breaches of fiduciary duties  On information and belief, the Institutional Insider Defendants appointed board members and participated in board meetings through their observation rights and through their appointed board members.  As a result, they had actual knowledge of the Director Defendants' and Defendant Vanek's fiduciary duties and actual knowledge of breaches of those fiduciary duties.

117.    Upon information and belief, the Arranger Defendants acted as facilitators of the 2004 Refinancing and knew of Meridian's insolvency   As evidenced in part by the closing dinner presentation, the Arranger Defendants knew that the Director Defendants and Defendant Vanek were breaching their fiduciary duties by "pay[ing] the mezz holders a massive dividend." Upon information and belief, the Institutional Insider Defendants and the Arranger Defendants knew that the Director Defendants and Vanek failed to undertake even the most basic steps to ascertain and verify that the company was solvent at the time it made massive payments to the holders of the "mezzanine debt".

118    Upon information and belief, the Institutional Insider Defendants knew that the Director Defendants and Defendant Vanek failed to inform themselves of available material information by failing to obtain proper advisors or to undertake even the most basic review of documentation that would have established that the vast majority of the so-called "mezzanine debt" was unsecured.

119    Upon information and belief, the Institutional Insider Defendants and the Arranger Defendants knew that some Director Defendants directly benefited from the massive payments to the holders of the "mezzanine debt" and the Arranger Defendants.

120    Upon information and belief, the Institutional Insider Defendants and the
Arranger Defendants knew that, despite Meridian's insolvency both before and after the 2004
Refinancing, the Director Defendants and Defendant Vanek failed to preserve Meridian's assets
for benefit of Meridian and all its stakeholders and claimants, and instead intentionally dissipated
and wasted the Meridian assets they used to pay Individual and Institutional Insider Defendants
for no corporate purpose  The Institutional Insider Defendants and the Arranger Defendants also
knew that the massive payouts to insiders served no corporate purpose to Meridian and that
Meridian received no consideration.

121    The Institutional Insider Defendants and the Arranger Defendants knowingly
induced and knowingly participated in the breaches of fiduciary duties. Upon information and
belief, the Institutional Insider Defendants and the Arranger Defendants provided substantial
assistance to the Director Defendants and Defendant Vanek with actual knowledge of the breach
by affirmatively assisting them in structuring the payouts to Meridian's insiders, preparing
documents to cause the payouts and making payments to themselves and other Meridian insiders.
Upon information and belief, the Institutional Insider Defendants and the Arranger Defendants
actively participated and induced these breaches of fiduciary duties in order to receive massive
payouts and fees, including intentionally fraudulent conveyances

122    The aiding and abetting by the Institutional Insider Defendants and the Arranger
Defendants of these breaches of duties was also the direct and proximate cause of damages to
Meridian. Meridian suffered damages as a result of the aiding and abetting of the breaches of
fiduciary duties which the Institutional Insider Defendants knowingly induced and in which they
participated, and in which the Arranger Defendants knowingly participated. The actual
knowledge of the breach of fiduciary duty and substantial assistance by the Institutional Insider

47

Defendants and the Arranger Defendants caused the depletion of Meridian's assets in return for little to no net value and depleted the amount of Meridian assets causing damages in an amount to be proven at trial

123.    Plaintiff is entitled to recover damages from the Institutional Insider Defendants and the Arranger Defendants for aiding and abetting breaches of fiduciary duties, gross negligence and corporate waste including interest and costs and such other and further relief as is just and appropriate.

**Fourth Claim for Relief**
**Civil Conspiracy to Commit Breaches of Fiduciary Duties**
(Against all the Defendants)

124.    Plaintiffs incorporate all preceding paragraphs of this Complaint as if fully set forth herein.

125    The Institutional Insider Defendants, Individual Insider Defendants, Director Defendants, and the Arranger Defendants conspired to accomplish at a minimum one unlawful objective, *i e.*, that the Director Defendants and Defendant Vanek would breach their fiduciary duties of loyalty to Meridian for the purpose of looting Meridian's assets through the payment of Meridian's assets to the Institutional Insider Defendants, Individual Insider Defendants and the Arranger Defendants as described above

126    The Institutional Insider Defendants, Individual Insider Defendants, Director Defendants and the Arranger Defendants agreed, each with the other, and had a meeting of the minds, to take all actions necessary to accomplish the breaches of the fiduciary duties of loyalty and fraudulent conveyances necessary to accomplish the looting and waste of Meridian's assets described above

48

127    The Institutional Insider Defendants and Defendants Anderson, Baker, Barton, Garcia and Wacaser entered a Shareholder Agreement and subsequent amendments  The Institutional Insider Defendants and their affiliates and Defendants Anderson, Baker, Barton, Garcia and Wacaser acted together in concert to control Meridian's day to day affairs and capital structure.  These Defendants through their share ownership and in accordance with the terms of the Shareholder Agreements had a meeting of the minds and acted in concert to control Meridian and accomplish their unlawful objectives

128.    Each of the Institutional Insider Defendants, Individual Insider Defendants, Director Defendants and the Arranger Defendants was at all relevant times fully aware of the conspiracy and substantially furthered it as described above

129.    Each of the Institutional Insider Defendants, Individual Insider Defendants, Director Defendants, and the Arranger Defendants took actions in furtherance of the conspiracy including but not limited to giving requisite approval required under the Shareholder Agreement, voting to approve the 2004 Refinancing, holding Meridian captive to prevent the refinancing, exercising control over Meridian's day to day decisions related to its capital structure and the refinancing and other acts in substantial furtherance of these unlawful objectives

130    The civil conspiracy was successful in looting Meridian's assets and therefore was the proximate cause of damages to Meridian.

131.    Plaintiff is entitled to recover those damages from the Institutional Insider Defendants, Individual Insider Defendants, Director Defendants and the Arranger Defendants, including interest and costs and such other and further relief as is just and appropriate.

### Fifth Claim for Relief
### Gross Negligence
(Against all the Defendants)

132.    Plaintiffs incorporate all preceding paragraphs of this Complaint as if fully set forth herein.

133.    The acts and omissions and other conduct alleged hereinabove constitute gross negligence by all the Defendants. Instead of preserving Meridian's assets and avoiding deepening its insolvency, the Institutional Insider Defendants, Individual Insider Defendants, Director Defendants and the Arranger Defendants caused Meridian to pay out money to the Institutional Insider Defendants, Individual Insider Defendants, Defendant Barton and the Arranger Defendants in completely one-sided exchanges – virtual gifts of Meridian's assets – that no business person of ordinary, sound judgment could have believed gave Meridian adequate compensation in return.

134.    The gross negligence led to the waste of Meridian's assets and therefore was the proximate cause of damages to Meridian.

135.    Plaintiff is entitled to recover those damages from the Institutional Insider Defendants, Individual Insider Defendants, Director Defendants and the Arranger Defendants, including interest and costs and such other and further relief as is just and appropriate.

50

**Sixth Claim for Relief**
**Preferential Transfers: 11 U.S.C. §§547 and §544**
(Against the Institutional Insider Defendants, Individual Insider Defendants, and Director
Defendants)

136    Plaintiffs incorporate all preceding paragraphs of this Complaint as if fully set

forth herein.

137    The Institutional and Individual Insider Defendants and Director Defendants

received, at a minimum, preferences as defined in 11 U.S.C. § 547, because they were insiders

within the meaning of 11 U.S.C. § 101(31) and the transfers meet all other requirements of 11

U.S.C. § 547. As insiders these defendants also received preferences as defined in corresponding

state laws including but not limited to Mich. Comp. Laws §§ 566.31 & 566.35 and New York

Debtor and Creditor Law, Article 10.

138    In connection with the 2004 Refinancing, Meridian made transfers of money to

the Institutional Insider Defendants, the Individual Insider Defendants and Director Defendants

for or on account of an antecedent debt owed by Meridian before such transfer was made. In

particular, Meridian paid the following amounts to the Institutional Insider Defendants, the

Individual Insider Defendants, and the Director Defendants for or on account of antecedent debt

owed by Meridian before such transfer was made:

| Meridian Payments on April 28, 2004 to the Institutional Insider Defendants Holding "mezzanine debt" | |
|---|---:|
| MetLife | $20,456,944.00 |
| Northwestern Mutual | $16,775,525.36 |
| Caisse | $7,171,046.58 |
| Skoog | $6,700,000.00 |
| Windward/Park | $4,244,663.15 |
| CSFB Holding | $2,342,186.04 |
| BACI | $1,146,549.85 |
| Suez Capital | $412,521.28 |
| WCA | $324,224.12 |
| Indosuez | $292,078.90 |
| SCP II | $18,180.74 |
| **Meridian Payments on April 28, 2004 to the Individual Insider Defendants holding "mezzanine debt"** | |
| Baker | $19,341.57 |
| Garcia | $6,927.92 |
| Anderson | $2,939.99 |
| **Meridian Payments on April 28, 2004 to Defendant Directors holding "mezzanine debt"** | |
| Barton | $54,450.54 |
| Wacaser | $10,560.22 |
| **Other Meridian Payments on April 28, 2004 to Institutional Insider Defendants** | |
| WCP | $580,228.21 |
| **Other Meridian Payments on the dates set forth in Paragraphs 93-96 to Director Defendants** | |
| Wacaser | $1,180,404.71 |
| Barton | $695,231.67 |
| McKay | $59,329.89 |
| Bedi | $78,348.98 |
| Walker | $47,066.05 |
| Maypole | $46,216.52 |
| Nickol | $45,833.77 |
| Graham | $37,729.36 |
| Hodgman | $1,487.20 |
| Van Ess | $2,500.00 |
| **Other Meridian Payments on the dates set forth in Paragraphs 93-96 to Individual Insider Defendants** | |
| Vanek | $494,284.22 |
| Jack Skoog | $175,000.00 |
| | |
| **Total** | **$63,421,800.84** |

139    When it made these transfers, Meridian was insolvent within the meaning of 11.
U.S.C. § 101 (32), applicable state laws including but not limited to Mich. Comp. Laws §§
566.32 and/or New York Debtor and Creditor Law, Article 10, Section 271 and applicable case
law.

140.    Each of the above Defendants were insiders as defined by 11 U.S.C. § 101 (31),
applicable state laws including but not limited to Mich. Comp. Laws § 566.31 and New York
Debtor and Creditor Law and applicable case law

141    All of these transfers were made within one year of the filing of Meridian's
bankruptcy petition. These payments were made on or after April 28, 2004; Meridian filed its
petition for bankruptcy protection on April 26, 2005.

142    As a result of these transfers, each of the above Defendants received more than
each would have received if Meridian's bankruptcy case had been a case under 11 USCS §§ 701
et seq.; the transfer had not been made; and such creditor received payment of such debt to the
extent provided by the provisions of this 11 USCS §§ 101 et seq.

143.    For each of the above listed transfers, the respective Defendant insider had
reasonable cause to believe that Meridian was insolvent. In fact each of these Defendants had
been informed numerous times by third party advisers as well as by Meridian that the company
was insolvent.

144.    For each of the above listed transfers, the respective Defendant insiders received
their payments without exchanging fair consideration or fair equivalent value.

145    Upon information and belief, numerous secured and unsecured creditors existed
whose claims arose before Meridian made the above transfers while Meridian was insolvent and
whose claims existed at the time of the commencement of Meridian's bankruptcy case. Such

53

unsecured creditors include, without limitation, Detroit Elevator Company of 2121 Berdette,

Ferndale, Michigan 48220; Pacer Global Logistics (Rail Van) of P.O. Box 71-1805, Columbus,

Ohio 43271-1805; and the New York State Department of Environmental Conservation.

### Seventh Claim for Relief
### Intentional Fraudulent Transfers: 11 U.S.C. §§ 548 and 544
(Against Defendants MetLife, Northwestern Mutual, Caisse, Skoog, Windward/Park, CSFB
Holding, BACI, Suez Capital, WCA, Indosuez, SCP II, Baker, Wacaser, Garcia, Anderson,
Barton, CSFB and Goldman Sachs)

146.    Plaintiffs incorporate all preceding paragraphs of this Complaint as if fully set

forth herein.

147.    Defendants MetLife, Northwestern Mutual, Caisse, Skoog, Windward/Park,

CSFB Holding, BACI, Suez Capital, WCA, Indosuez, SCP II, Baker, Wacaser, Garcia,

Anderson, Barton, CSFB and Goldman Sachs took their money as an intentionally fraudulent

transfer in violation of 11 U.S.C. § 548 and §544 through state fraudulent transfer statutes

including but not limited to Mich. Comp. Laws § 566 34(1)(a) & (2) and/or New York Debtor

and Creditor Law, Article 10, Section 276 and applicable case law.

148    On April 28, 2006, Meridian made the following transfers of property with actual

intent to hinder, delay, or defraud creditors to which Meridian was and became, on and after the

date that such transfers were made, indebted:

| Payments to the Institutional Insider Defendants | |
|---|---|
| MetLife | $20,456,944.00 |
| Northwestern Mutual | $16,775,525.36 |
| Caisse | $7,171,046.58 |
| Skoog | $6,700,000.00 |
| Windward/Park | $4,244,663.15 |
| CSFB Holding | $2,342,186.04 |
| BACI | $1,146,549.85 |
| Suez Capital | $412,521.28 |
| WCA | $324,224.12 |
| Indosuez | $292,078.90 |
| SCP II | $18,180.74 |
| **Payments to the Individual Insider Defendants** | |
| Baker | $19,341.57 |
| Garcia | $6,927.92 |
| Anderson | $2,939.99 |
| **Payments to the Director Defendants** | |
| Barton | $54,450.54 |
| Wacaser | $10,560.22 |
| **Payments to Arranger Defendants** | |
| CSFB | $17,087,742.00 |
| Goldman Sachs | $3,813,122.52 |
| | |
| **Total** | **$80,879,004.78** |

149.    Meridian was insolvent within the meaning of 11. U.S.C. § 101 (32) and applicable state laws including but not limited to Mich. Comp. Laws § 566 31, and/or New York Debtor and Creditor Law and applicable case law when it made these transfers

150.    As described above with particularity, the transfers to the Defendants MetLife, Northwestern Mutual, Caisse, Skoog, Windward/Park, CSFB Holding, BACI, Suez Capital, WCA, Indosuez, SCP II, Baker, Wacaser, Garcia, Anderson, Barton, and CSFB were transfers Meridian made to insiders or affiliates of those insiders

151.    As described above with particularity, all of these Defendants and Defendant Goldman Sachs knew or had reasonable cause to believe that Meridian was insolvent  On numerous occasions these Defendants had been informed either by third party advisors like

McKinsey or Stout Risius or by information provided by Meridian that prior to the 2004 Refinancing Meridian was insolvent, undercapitalized and unable to pay its debts going forward. Upon information and belief, however, the information provided to these Defendants was not known and intentionally withheld from parties that would become creditors of Meridian in the 2004 Refinancing  This information was withheld to allow massive payments to insiders while inducing creditors to continue to loan money to the company thereby subsidizing the massive improper payments

152    As described above with particularity, the transfers above occurred contemporaneous with significant incurrence of a substantial debt.

153    The transfers set forth above totaling over $80 million were substantially all of Meridian's unencumbered assets

154    As set forth with particularity above, for each of the above listed transfers, the value of the consideration received by Meridian was not reasonably equivalent to the value of the money paid to that Defendant  Reasonable equivalent value was not provided by the Director Defendants, the Individual Insider Defendants, or the Arranger Defendants because any value provided by such Defendants to Meridian was far outweighed by the damage their actions caused to Meridian

155.    As set forth above, the transfers listed above to those Defendants occurred on the same date, April 28, 2004, or shortly after Meridian incurred substantial debt totaling over $485 million

156    Numerous unsecured creditors existed whose claims arose before Meridian made the above transfers while Meridian was insolvent  Such unsecured creditors include, without limitation, Detroit Elevator Company of 2121 Berdette, Ferndale, Michigan 48220; Pacer Global

56

Logistics (Rail Van) of P.O Box 71-1805, Columbus, Ohio 43271-1805; and the New York

State Department of Environmental Conservation.

**Eighth Claim for Relief**
**Constructive Fraudulent Transfers:  11 U.S.C. §§ 548 and 544**
(Against All Defendants)

157.    Plaintiffs incorporate all preceding paragraphs of this Complaint as if fully set

forth herein.

158.    Institutional Insider Defendants, Individual Insider Defendants, Director

Defendants, and Arranger Defendants took their money as a constructive fraudulent transfer in

violation of 11 U S C. § 548 and § 544 through state fraudulent transfer statutes including but not

limited to Mich. Comp Laws § 566.34(1)(b),  566.35(1) & 566.32 and/or New York Debtor and

Creditor Law, Article 10, Sections 273-275.

159.    On or after April 28, 2006, but before Meridian filed for bankruptcy protection on

April 26, 2005, Meridian made the following transfers of property:

| Payments to the Institutional Insider Defendants | |
|---|---|
| MetLife | $20,456,944.00 |
| Northwestern Mutual | $16,775,525.36 |
| Caisse | $7,171,046.58 |
| Skoog | $6,700,000.00 |
| Windward/Park | $4,244,663.15 |
| CSFB Holding | $2,342,186.04 |
| BACI | $1,146,549.85 |
| WCP | $580,228.21 |
| Suez Capital | $412,521.28 |
| WCA | $324,224.12 |
| Indosuez | $292,078.90 |
| SCP II | $18,180.74 |
| Payments to the Individual Insider Defendants | |
| Vanek | $494,284.22 |
| Jack Skoog | $175,000.00 |
| Baker | $19,341.57 |
| Wacaser | $10,560.22 |
| Garcia | $6,927.92 |
| Anderson | $2,939.99 |
| Payments to Arranger Defendants | |
| CSFB | $17,087,742.00 |
| Goldman Sachs | $3,813,122.52 |
| Payments to Director Defendants | |
| Wacaser | $1,190,964.93 |
| Barton | $749,682.21 |
| McKay | $59,329.89 |
| Bedi | $78,348.98 |
| Walker | $47,066.05 |
| Maypole | $46,216.52 |
| Nickol | $45,833.77 |
| Graham | $37,729.36 |
| Hodgman | $1,487.20 |
| Van Ess | $2,500.00 |
| Total | $84,041,146.68 |

160.    Meridian received less than a reasonably equivalent value and/or fair consideration in exchange for each such transfer. Reasonable equivalent value was not provided by the Director Defendants, the Individual Insider Defendants, or the Arranger Defendants

because any value provided by such Defendants to Meridian was far outweighed by the damage their actions caused to Meridian

161. Meridian was insolvent as defined by 11 U.S.C. § 101(32) on each date that such transfer was made or became insolvent as a result of such transfer or obligation

162. As described above with particularity, the transfers to the Institutional Insider Defendants, the Individual Insider Defendants, the Director Defendants and Defendant CSFB were transfers Meridian made to insiders or affiliates of those insiders

163. For each of the above listed transfers, the respective Defendant had reasonable cause to believe that Meridian was insolvent. In fact each of these Defendants had been informed numerous times by third party advisers as well as by Meridian that the company was insolvent

164. At the time of each transfer, Meridian was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Meridian was an unreasonably small capital

165. Meridian intended to incur or believed that it had incurred, debts that would be beyond the debtor's ability to pay as such debts matured.

166. Meridian made transfers to the Director Defendants when they were insiders and, except for the transfer to Defendant Barton in respect of "mezzanine debt" held by Defendant Barton, the transfers were made to or for the benefit of the Director Defendants as insiders under an employment contract and not in the ordinary course of business.

167. Numerous unsecured creditors existed whose claims arose before Meridian made the above transfers while Meridian was insolvent. Such unsecured creditors include, without limitation, Detroit Elevator Company of 2121 Berdette, Ferndale, Michigan 48220; Pacer Global

Logistics (Rail Van) of P.O. Box 71-1805, Columbus, Ohio 43271-1805; and the New York

State Department of Environmental Conservation.

168    Plaintiff is entitled to recover the fraudulent transfers to Defendants including

interest and costs and that Plaintiff has incurred and such other and further relief as is just and

appropriate.

**Ninth Claim for Relief**
**Turnover of Avoided Transfers: 11 U.S.C. § 550**
(Against All Defendants)

169.    Plaintiffs incorporate all preceding paragraphs of this Complaint as if fully set

forth herein.

170.    By reason of the foregoing, Plaintiffs are entitled to recover the property

transferred or the value of the property transferred to Defendants pursuant to 11.U.S.C. § 550.

**Tenth Claim for Relief**
**Attorney Fees**
(Against All Defendants)

171.    Plaintiffs incorporate all preceding paragraphs of this Complaint as if fully set

forth herein.

172    Plaintiff is entitled to attorneys' fees, costs. interest and expenses as a result of the

fraudulent transfers and other improprieties set forth above   Plaintiff is entitled to such fees as

set forth in the bankruptcy code, common law and corresponding state laws including but not

limited to Michigan's Uniform Fraudulent Transfer Act and/or New York Debtor and Creditor

Law, Article 10, Section 276-a.

## JURY DEMAND

WHEREFORE, Plaintiff prays for and demands a trial by jury of its claims set forth

herein as provided under FED.R CIV.P. 38.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A.      for judgment in Plaintiff's favor on the counts recited above;

B.      for compensatory damages in an amount to be proved at trial;

D.      for exemplary damages to the full extent permitted by law;

F.      for attorney's fees and the costs and disbursements of this action;

F.      for pre-judgment and post-judgment interest and court costs; and

G.      for such other relief as the Court may deem proper and just

DATED: April 20, 2007                          Respectfully submitted,

                                               By:
                                               Attorneys for Plaintiff

                                               HALPERIN BATTAGLIA RAICHT, LLP
                                               Alan D. Halperin (AH-8432)
                                               Neal W. Cohen (NC-3573)
                                               555 Madison Avenue, 9th Floor
                                               New York, NY 10022
                                               Telephone: (212) 765-9100
                                               Facsimile: (212) 765-0964

                                               James B. Heaton, III
                                               Steven J. Nachtwey
                                               John D. Byars
                                               BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
                                               54 West Hubbard Street, 3rd Floor
                                               Chicago, IL 60610
                                               Telephone: (312) 494-4400
                                               Facsimile: (312) 494-4440