IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OCEAN RIDGE CAPITAL ADVISORS, LLC, as Litigation Trustee of THE MAS LITIGATION TRUST,<br><br>                                    Plaintiff,<br><br>            -against-<br><br>METROPOLITAN LIFE INSURANCE COMPANY, THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY, CAPITAL D'AMERIQUE CDPQ INC., CAISSE DE DEPOT ET PLACEMENT DU QUEBEC, CSFB LP HOLDING, SKOOG FAMILY INVESTMENTS, LLC, BANCAMERICA CAPITAL INVESTORS II, L.P., WINDWARD/PARK AB III, L.L.C., WINDWARD CAPITAL PARTNERS L.P., WINDWARD CAPITAL ASSOCIATES, L.P., SUEZ CAPITAL PARTNERS II, L.P., INDOSUEZ CAPITAL CO-INVEST PARTNERS, L.P., SCP II ASSOCIATES, CREDIT SUISSE FIRST BOSTON (USA), INC., CREDIT SUISSE FIRST BOSTON, GOLDMAN SACHS CREDIT PARTNERS L.P., JEFFREY A. ANDERSON, JON F. BAKER, JOSE R. GARCIA, ROBERT H. BARTON III, H.H. WACASER, PETER S. MACDONALD, GARY SWENSON, JOHN F. MAYPOLE, THOMAS GRAHAM, DONALD A. MCKAY, HENRY A. NICKOL, JEFFREY HODGMAN, A. KIPP KOESTER, CRAIG VAN ESS, GURMINDER S. BEDI, THOMAS WALKER, JACK SKOOG AND DEAN VANEK<br><br>                                    Defendants. | **THIRD-PARTY COMPLAINT**<br><br>Case No. 07 CV 3213 (SAS) |
| METROPOLITAN LIFE INSURANCE COMPANY AND THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY,<br><br>                        Third-Party Plaintiffs,<br><br>            -against-<br><br>RICHARD NEWSTED,<br><br>                        Third-Party Defendant | |

Defendants and Third-Party Plaintiffs Metropolitan Life Insurance Company ("MetLife") and The Northwestern Mutual Life Insurance Company ("NM"), by their counsel Sonnenschein Nath & Rosenthal LLP, hereby state their Third-Party Complaint against Third-Party Defendant Richard Newsted, upon knowledge with regard to their own actions and upon information and belief as to all other matters, as follows:

**Background**

1.  Meridian Automotive Systems, Inc. ("Meridian" or "MAS") is a Michigan corporation in the business of manufacturing car and truck components. This action arises out of Meridian's recently concluded Chapter 11 bankruptcy proceedings.

2.  Between 1997 and 2001, Meridian greatly expanded its business operations, primarily through strategic acquisitions. As a result of this expansion strategy, Meridian's net sales more than tripled, and adjusted EBITDA more than doubled.

3.  Beginning in 2000 and continuing over the next couple of years, however, Meridian's business began to suffer along with the rest of the auto industry. As 2004 approached, Meridian had hundreds of millions in corporate debt scheduled to come due in the next three years. In late 2003, Bank of America, holder of Meridian's senior secured debt, began threatening acceleration of over $300 million in loans based on anticipated future covenant defaults.

4.  Bank of America made aggressive and expensive covenant relief demands that were not a financially feasible option for Meridian, precipitating a need for Meridian to consider various alternatives. These included a sale of the company, a sale of company divisions, refinancing, and other business means to ensure further growth.

5.  Under a Shareholders Agreement executed by Meridian and its shareholders in 1997 (and subsequently amended), the terms of a sale or refinancing required virtual unanimity

amongst various of Meridian's investors and management. The compromise that surfaced during these internal negotiations was to seek to refinance Meridian's debt.

6. Meridian retained the services of investment banks Credit Suisse First Boston ("CSFB") and Goldman Sachs Credit Partners L.P. ("Goldman") to find replacement debt financing. In April 2004, Meridian refinanced its existing debt with Bank of America by entering into the First and Second Lien Credit Agreements, and related agreements, for a financing package of $485 million with a syndicate of new lenders (the "2004 Refinancing").

7. Under the 2004 Refinancing, $337 million was used to pay off in full the Bank of America senior secured credit facility. Approximately $53 million was used to pay down a portion of Meridian's subordinated ("mezzanine") debt, approximately $6.7 million to compromise a note held by Meridian's founder and former owner, Jack Skoog.

8. Third-Party Plaintiffs MetLife and NM were among the mezzanine debt holders. The payment the mezzanine debt holders received -- $53 million -- constituted only roughly 25 percent of their outstanding mezzanine debt. On the remaining 75 percent of their loans, the mezzanine debt holders agreed to forego the potential payment of current cash interest, to put off the maturity date of the loan for a significant additional period of years, and to give up a second lien on the assets of Meridian.

9. Meridian reached agreements with the mezzanine debt holders on the restructuring of their debt not only to achieve the compromise amongst Meridian's existing stakeholders, but also to facilitate an agreement with the new lenders in the 2004 Refinancing.

10. Third-Party Defendant Richard Newsted was Meridian's Chief Financial Officer ("CFO") from May 2001 through March 2005 and, accordingly, was the Meridian CFO prior to, during, and following the 2004 Refinancing. Newsted also held more than 20% of Meridian's Class A shares at the time of the 2004 Refinancing. Newsted was a party to, and active

participant in, the discussions and negotiations at Meridian regarding the 2004 Refinancing. Newsted supported a refinancing as the course Meridian should pursue. He also supported the deal that ultimately was consummated as the 2004 Refinancing. And as Meridian's CFO, Newsted was Meridian's primary source of financial information and was its primary contact with outside consultants who were assisting Meridian in formulating and executing its strategy.

### Meridian's Bankruptcy

11. Following the 2004 Refinancing, the auto industry continued to decline.

12. In the period leading up to its Chapter 11 Bankruptcy filing in April 2005, Meridian experienced challenging industry conditions, including exponential increases in costs of essential commodities such as resin, nickel and steel, ongoing pricing pressure from original equipment manufacturers ("OEMs"), elimination of accelerated payment programs from certain OEMs, increased labor costs, and cyclical demand. Such conditions resulted in a steady deterioration of Meridian's liquidity position and forced Meridian to seek Chapter 11 protection while Meridian restructured its balance sheet.

13. During that same period, the loans made to Meridian in the 2004 Refinancing traded in the secondary debt market at a discount, with much of the indebtedness ultimately purchased by hedge funds. (The First and Second Lien Lenders and their successors-in-interest are referred to herein as the "Pre-Petition Lenders".)

14. Meridian filed its Chapter 11 bankruptcy petition on April 26, 2005, just two days short of the one year anniversary of the 2004 Refinancing.

15. The exact timing of the filing was dictated by the Pre-Petition Lenders. Even though Meridian did not attribute the cause of its bankruptcy filing, even in part, to the 2004 Refinancing, the Pre-Petition Lenders apparently intended to threaten to take advantage of the

Bankruptcy Code provisions that make payments in the year prior to a bankruptcy filing subject to return under insider preference and fraudulent transfer theories.

16. While covenant breaches were expected, those breaches would not have matured until May 1, 2005, more than one year after the transfers in the 2004 Refinancing were made. The Pre-Petition Lenders threatened to sue Meridian's Board of Directors personally if the filing did not take place prior to the one year anniversary of the 2004 Refinancing. The Pre-Petition Lenders also blocked Meridian from entering into a favorable receivables securitization program that would have extended Meridian's ability to pay debts as they became due.

17. Meridian's plan of reorganization (the "Plan") was proposed jointly by Meridian and certain of the Pre-Petition Lenders -- Camulos Master Fund LP, DK Acquisition Partners, L.P. and Stanfield Capital Partners LLC (the "New Owners"). The New Owners, collectively, held more than 80% of the outstanding Second Lien debt and a large portion of the First Lien debt.

18. Under the Plan, the Pre-Petition Lenders were given 100% of the stock in reorganized "New Meridian" and the right to appoint four of the five members of New Meridian's board of directors. The fifth board member would be New Meridian's Chief Executive Officer.

19. Also under the Plan, the avoidance and related claims that had been preserved by the forced timing of Meridian's bankruptcy filing were placed into a trust and survived the bankruptcy. Plaintiff Ocean Ridge Capital Advisors, LLC (the "Litigation Trustee") for the MAS Litigation Trust (the "Litigation Trust") was appointed to pursue those claims. The beneficiaries of the Litigation Trust are the Pre-Petition Lenders. Representatives of the Pre-Petition Lenders sit on an "Oversight Committee" established to control the actions of the Litigation Trustee. The New Owners control three of the five seats on the Oversight Committee.

20. Accordingly, the Pre-Petition Lenders proposed the Plan and, under it, have obtained control of New Meridian and the Litigation Trust.

21. The Plan also named Newsted as the CEO and President of New Meridian.

### The Litigation Trust's Action Against Defendants

22. In this action, the Litigation Trustee alleges that Meridian's mezzanine debt holders (the "Institutional Insider Defendants"), all of its directors (the "Director Defendants"), its former owner (Jack Skoog), four of its former officers (the "Individual Insider Defendants") and its investment bankers (CSFB and Goldman, the "Arranger Defendants") all engaged in a conspiracy to "loot" Meridian through the 2004 Refinancing.

23. The Complaint seeks to recover the $53 million paid to the Institutional Insider Defendants, including MetLife and NM, the $6.7 million paid to Jack Skoog, more than $20 million paid as fees to the Arranger Defendants, and other payments made in the year prior to the bankruptcy filing under several legal theories.

24. Central to these legal theories is (a) that Meridian was insolvent at the time of the 2004 Refinancing, (b) that the defendants knew it was insolvent, and (c) that the Institutional Insider Defendants and Jack Skoog had sufficient control over Meridian -- through shareholdings and board appointment rights -- to force it into the 2004 Refinancing to extract cash from Meridian.

25. MetLife and NM believe that the Litigation Trustee's claims are without merit. While their positions are more fully set forth in their Answers to the Complaint, they contend that Meridian was not insolvent, that they did not control Meridian or force it into the 2004 Refinancing, and that the payments they received in the 2004 Refinancing were for funds that Meridian owed to them in the form of mezzanine debt.

26. While naming 34 entities and individuals as co-conspirators and defendants, the Complaint fails to name Newsted as a defendant. The Complaint is conspicuously sanitized of any mention of Newsted's name, conduct, or role in the 2004 Refinancing.

27. Newsted was the architect of the 2004 Refinancing.

28. While MetLife and NM dispute the claims and fact allegations made by the Litigation Trustee (as set forth in detail in their pleadings), if their conduct in connection with the 2004 Refinancing is adjudged to be actionable, given Newsted's role in the 2004 Refinancing, Newsted also should be held liable.

29. Many of the allegations leveled against MetLife and NM in the Complaint as a purported basis for recovery apply equally to Newsted, but the Litigation Trustee chose not to name Newsted as a participant, co-conspirator, or actor in connection with its claims.

30. For example, the Litigation Trust alleges that through "the Shareholder Agreement and amendments the Institutional Insider Defendants had a meeting of the minds and agreed to take actions necessary to accomplish their objectives including massive payments to themselves through the 2004 Refinancing." Newsted was a party to the Shareholder Agreement described in the Complaint. Newsted held more than 20% of Meridian's outstanding Class A common stock at the time of the 2004 Refinancing.

31. Newsted actively participated in board meetings of Meridian, including making presentations about Meridian's financial condition and the options it had for addressing the demands of Bank of America.

32. With respect to the Meridian financial information the named defendants are alleged to have received -- including from consulting firms like McKinsey, Stout Risius Ross, and CSFB -- Newsted also received that information and, in many cases, supplied it himself.

33. Newsted gave presentations in connection with the 2004 Refinancing to rating agencies, to potential lenders, and to Meridian's Board of Directors and board observers.

34. MetLife and NM relied on Newsted and his reports for information about Meridian's financial condition, the progress of negotiations with Bank of America over covenant issues, the progress of CSFB's efforts to secure replacement financing, and the parameters of the final terms of the 2004 Refinancing.

35. Newsted was in favor of the 2004 Refinancing, even when the proposed payout to mezzanine debt holders and Jack Skoog was $80 million, or $20 million more than ultimately paid out in the 2004 Refinancing. In February 2004, Newsted presented options for allocating the $80 million amongst mezzanine debt holders and Jack Skoog.

36. Newsted executed the 2004 Refinancing loan agreements on behalf of Meridian.

37. Newsted executed the representations of solvency in the 2004 Refinancing loan agreements on behalf of Meridian, representing to all other parties to the transaction that Meridian was solvent immediately after the 2004 Refinancing.

38. Newsted received compensation and transfers from Meridian during the year prior to Meridian's Chapter 11 bankruptcy filing. But the Litigation Trustee, under the direction of the New Owners, did not seek to recoup transfers to Newsted, as they have from other officers of Meridian. Instead, the New Owners made Newsted the CEO, President, and Director of New Meridian, to do their bidding.

39. Newsted has attended meetings with the Litigation Trustee's counsel and assisted the Litigation Trustee's counsel in collecting documents it requested to assist in the preparation of the Complaint in this action, which has as its central allegation that Meridian was insolvent at the time of the 2004 Refinancing, contrary to Newsted's representations of solvency.

40. Newsted's role in the 2004 Refinancing is undeniable. If the conduct of MetLife and NM in connection with the 2004 Refinancing is actionable, Newsted's conduct must also be actionable.

## Jurisdiction

41. Upon information and belief, Third-Party Defendant Newsted resides in the state of Michigan.

42. Third-Party Plaintiff Metropolitan Life Insurance Company is a New York corporation with its principle place of business in New York.

43. Third-Party Plaintiff The Northwestern Mutual Life Insurance Company is a Wisconsin corporation with its principle place of business in Wisconsin.

44. This Court has subject matter jurisdiction over this Third-Party civil action pursuant to 28 U.S.C. §§ 1331, 1332, 1334, and 1367, as it is a civil proceeding arising under title 11 of the United States Code, including but not limited to §§ 541, 544, 547, and 550.

45. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 and 1409.

46. The Litigation Trustee alleges in the Complaint in paragraphs 79, 80, 83, and 85 that certain meetings and incidents related to the 2004 Refinancing, including the solicitation of the new lenders and the closing of the transaction, took place in New York. Upon information and belief, Newsted participated in the New York meetings and incidents alleged in the Complaint in paragraphs 79, 80, 83, and 85.

## COUNT I - CONTRIBUTION

47. The Third-Party Plaintiffs incorporate all preceding paragraphs of this Third-Party Complaint as if fully set forth herein.

48. The Litigation Trustee makes claims against MetLife and NM for Unlawful Distribution In Violation of Mich. Comp. Law § 450.1345, Aiding and Abetting Breaches of

Fiduciary Duties, Civil Conspiracy to Commit Breaches of Fiduciary Duties, Gross Negligence, Preferential Transfers (11 U.S.C. §§ 544 and 547), Intentional Fraudulent Transfers (11 U.S.C. §§ 544 and 548), Constructive Fraudulent Transfers (11 U.S.C. §§ 544 and 548), Turnover of Avoided Transfers (11 U.S.C. §§ 550), and Attorney Fees. (altogether, the "Litigation Trustee's Claims").

49.     The Litigation Trustee's Claims are based upon a series of fact allegations in the Complaint which are included by reference -- as allegations only -- as if fully set forth herein.

50.     MetLife and NM dispute the Litigation Trustee's Claims, and dispute the fact allegations that support those claims (as set forth in their answers to the Complaint).

51.     Newsted supplied information to MetLife and NM about Meridian's financial condition and negotiated the 2004 Refinancing on Meridian's behalf.

52.     To the extent that the Litigation Trustee prevails on any of the Litigation Trustee's Claims, MetLife and NM contend, in the alternative, that based on his knowledge and conduct as alleged herein and in the Complaint, Newsted is a joint, concurrent, successive, independent, and/or alternative tortfeasor.

53.     To the extent that the Litigation Trustee prevails on any of the Litigation Trustee's Claims, MetLife and NM contend, in the alternative, that if Meridian was insolvent or in the zone of insolvency, Newsted owed a fiduciary duty, as an officer of Meridian, to Meridian's shareholders and creditors at the time of the 2004 Refinancing, including but not limited to the Pre-Petition Lenders, the beneficiaries of the Litigation Trust, MetLife and NM.

54.     Newsted owed MetLife, and NM a duty to use reasonable care in the representations of Meridian's financial condition and solvency to them, to the Meridian Board of Directors, and to the Pre-Petition Lenders.

55. To the extent that the Litigation Trustee prevails on any of the Litigation Trustee's Claims, MetLife and NM contend, in the alternative, that they are entitled to seek contribution from Newsted for any damages, fees, and/or costs that they incurred or that are assessed against them.

56. To the extent that the Litigation Trustee prevails on any of the Litigation Trustee's Claims, MetLife and NM contend, in the alternative, that Newsted is more culpable than MetLife and/or NM for any damages that may have been assessed against MetLife and/or NM and, accordingly, such damages are recoverable from Newsted.

57. To the extent that the Litigation Trustee prevails on any of the Litigation Trustee's Claims, MetLife and NM contend, in the alternative, that they are entitled to recover damages from Newsted under a theory of contribution in an amount to be determined, including damages, attorneys fees, and costs incurred by and assessed against them.

## COUNT II - FRAUD

58. The Third-Party Plaintiffs incorporate all preceding paragraphs of this Third-Party Complaint as if fully set forth herein.

59. Newsted made representations to various parties, including MetLife and NM, about the financial condition of Meridian prior to the 2004 Refinancing, including that Meridian was solvent and would be solvent immediately after the 2004 Refinancing.

60. Newsted executed documents at the time of the 2004 Refinancing in which he asserted and represented that Meridian would be solvent immediately after the 2004 Refinancing.

61. To the extent it is found that Newsted's representations of Meridian's solvency were false, such representations were knowingly and falsely made by Newsted with an intent to cause MetLife and NM to rely upon such false representations and to enter into the 2004 Refinancing.

62. Newsted made his representations at a time when he knew that certain holders of Meridian debt, including MetLife and NM, were interested in exploring a sale of Meridian or of certain division(s) of Meridian.

63. A sale of Meridian would have put Newsted's position as an officer of Meridian at risk. A sale of Meridian in 2004 also would have resulted in Newsted's shares in Meridian having little or no value. On the other hand, a refinancing of Meridian's debt would have ensured that Newsted would retain his position as CFO and leave open the possibility that his shares could increase in value.

64. MetLife and NM relied upon Newsted's representations as to the solvency of Meridian when they agreed to the terms of the 2004 Refinancing.

65. As a result of relying on Newsted's representations, Meridian entered into the 2004 Refinancing, causing damages to MetLife and NM in an amount to be determined at trial. Such damages include any damages, costs and/or legal fees assessed against them in this lawsuit, the amounts MetLife and NM would have received on account of the Meridian debt they held had they not agreed to the 2004 Refinancing, and fees and expenses they have incurred in defending this action.

## COUNT III - NEGLIGENT MISREPRESENTATION

66. The Third-Party Plaintiffs incorporate all preceding paragraphs of this Third-Party Complaint as if fully set forth herein.

67. Newsted made representations to various parties, including MetLife and NM, about the financial condition of Meridian prior to the 2004 Refinancing, including that Meridian was solvent and would be solvent immediately following the 2004 Refinancing.

68. Newsted executed documents at the time of the 2004 Refinancing in which it was asserted that Meridian was solvent.

69. To the extent it is found that Newsted's representations of Meridian's solvency were false, such representations were false due to Newsted's representations as to the financing condition of Meridian, and false due to Newsted's negligence and/or failure to exercise reasonable care. Newsted owed MetLife and NM a duty to use reasonable care in the representations of Meridian's financial condition and solvency to them, to the Meridian Board of Directors, and to the Pre-Petition Lenders.

70. Newsted made his representations at a time when he knew that certain holders of Meridian debt were interested in exploring a sale of Meridian or of certain division(s) of Meridian.

71. A sale of Meridian would have put Newsted's position as an officer of Meridian at risk. A sale of Meridian in 2004 also would have resulted in Newsted's shares in Meridian having little or no value. A refinancing of Meridian's debt would have ensured that Newsted would retain his position as CFO and leave open the possibility that his shares could increase in value.

72. Newsted made representations as to the solvency of Meridian, and in favor of the 2004 Refinancing, with the intent to induce MetLife and NM to agree to the 2004 Refinancing.

73. MetLife and NM relied upon Newsted's representations as to the solvency of Meridian when they agreed to the terms of the 2004 Refinancing.

74. As a result of relying on Newsted's representations, Meridian entered into the 2004 Refinancing, causing damages to MetLife and NM in an amount to be determined at trial. Such damages include any damages, costs and/or legal fees assessed against them in this lawsuit, the amounts MetLife and NM would have received on account of the Meridian debt they held had they not agreed to the 2004 Refinancing, and fees and expenses they have incurred in defending this action.

## Prayer For Relief

WHEREFORE, Third-Party Plaintiffs pray for judgment in their favor on the counts recited above, for compensatory damages in an amount to be proved at trial, for consequential damages in an amount to be proved at trial, for exemplary damages to the full extent permitted by law, for pre-judgment and post-judgment interest and court costs, and for such other relief as the Court may deem proper and just.

Dated: New York, New York
       January 31, 2008

                                  Respectfully submitted,

                                  */s/ signature*

                                  Reid L. Ashinoff (RA-0281)
                                  Gary Meyerhoff (GM-8267)
                                  D. Farrington Yates (DY-8383)
                                  Benito Delfin, Jr. (BD-1216)

                                  Sonnenschein Nath & Rosenthal, LLP
                                  1221 Avenue of the Americas
                                  New York, New York  10020
                                  (Tel).: (212) 768-6700
                                  (Fax).: (212) 768-6800

                                  *Attorneys for Defendants and Third-Party*
                                  *Plaintiffs Metropolitan Life Ins. Co.*
                                  *and The Northwestern Mutual Life Ins. Co.*

17586635